U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN - 5 2011

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN RE DISCIPLINARY AND      §
SANCTION PROCEEDINGS AGAINST §
JOHN P. GILLIG, TRIPLE TEE   §   NO. 4:10-MC-018-A
GOLF, INC., S. TRACY LONG,   §
MELVIN K. SILVERMAN, and     §
JOSEPH F. CLEVELAND, JR.     §

MEMORANDUM OPINION
and
ORDER

After having considered the material relevant to these
disciplinary and sanction proceedings against S. Tracy Long
("Long"), Melvin K. Silverman ("Silverman"), Joseph F. Cleveland,
Jr. ("Cleveland"), John P. Gillig ("Gillig"), and Triple Tee
Golf, Inc. ("Triple Tee"), the court has concluded that (1)
Silverman and Cleveland each has engaged in conduct unbecoming a
member of the bar, subjecting him to discipline under the
authority of Rule LR 83.8 of the Local Civil Rules of this court
("Rule 83.8"); (2) Silverman has engaged in unethical behavior,
subjecting him to disciplinary action under the authority of Rule
83.8; and (3) Silverman, Cleveland, and Long each has engaged in
conduct subjecting him and Gillig to sanctions under the
authority of Rules 11(b) and (c) of the Federal Rules of Civil
Procedure ("Rule 11(b)" and "Rule 11(c)," respectively).

# CONTENTS

I.   The Backdrop for These Proceedings . . . . . . . . . . . 4

II.  The Documents at Issue in These Proceedings . . . . . . . 7

     A.  The First Set--The Response in Opposition to Nike's
         Motion to Reassign Triple Tee II to the Undersigned,
         and Its Supporting Declaration of Gillig . . . . . . 8

     B.  The Second Set--Plaintiffs' Motion to Recuse, and
         Its Supporting Declaration of Long . . . . . . . . 11

III. Events in Triple Tee I and Triple Tee II
     That Provide (1) Context for Testimony and
     Exhibits Received at the Hearing Conducted in
     These Proceedings and (2) the Motivations for the
     Filing of the Gillig and Long Declarations . . . . . . 14

         1.  The July 6, 2005, Pretrial Conference in
             Triple Tee I . . . . . . . . . . . . . . . . 14
         2.  Events Related to the First Grant of Summary
             Judgment in Triple Tee I . . . . . . . . . . 16
         3.  The July 5, 2007, Pretrial Conference in
             Triple Tee I . . . . . . . . . . . . . . . . 18
         4.  The July 10, 2007, Telephone Conference . . . 18
         5.  The Taking of Evidence in Triple Tee I in the
             Courtroom on July 18, 2007 . . . . . . . . . 20
         6.  Findings Expressed by the Court in the
             Memorandum Opinion and Order Finally
             Dismissing Triple Tee I . . . . . . . . . . . 21
         7.  Gillig and Triple Tee's Opposition to Nike's
             Motion to Transfer Triple Tee II from Florida
             to the Docket of the Undersigned, and the
             Gillig Declaration Filed in Support of the
             Opposition . . . . . . . . . . . . . . . . . 22
         8.  The Order of the Florida Judge Granting
             Nike's Motion to Transfer . . . . . . . . . . 23
         9.  The Declarations of Renk, van Es, and
             Martinez Filed by Nike in Triple Tee II in
             Support of Its Motion to Reassign the Case
             to the Undersigned . . . . . . . . . . . . . 24

      10.    The Order Granting Nike's Motion to
              Reassign Triple Tee II . . . . . . . . . . . 26

      11.    The Supplemental Declaration of Gillig
              Proposed for Filing in Opposition to Nike's
              Motion to Reassign Triple Tee II . . . . . . . 27

IV.   Summary of the Evidence Received at the
    October 27-28 Hearing . . . . . . . . . . . . . . . 28

    A.    West . . . . . . . . . . . . . . . . . . . . 29
    B.    Gillig . . . . . . . . . . . . . . . . . . . 30
    C.    Martinez . . . . . . . . . . . . . . . . . . 38
    D.    Suder . . . . . . . . . . . . . . . . . . . . 39
    E.    Dunn . . . . . . . . . . . . . . . . . . . . 44
    F.    Taylor . . . . . . . . . . . . . . . . . . . 45
    G.    Renk . . . . . . . . . . . . . . . . . . . . 46
    H.    Stites . . . . . . . . . . . . . . . . . . . 49
    I.    Casto . . . . . . . . . . . . . . . . . . . . 50
    J.    Silverman . . . . . . . . . . . . . . . . . . 51
    K.    Long . . . . . . . . . . . . . . . . . . . . 59
    L.    Cleveland . . . . . . . . . . . . . . . . . . 63

V.    Analysis . . . . . . . . . . . . . . . . . . . . . 80

    A.    The Gillig and Long Declarations Contained False
        Factual Contentions That Did Not Have Evidentiary
        Support, and the Declarations Were Presented for an
        Improper Purpose . . . . . . . . . . . . . . . 80

    B.    The Rule 11 Violations . . . . . . . . . . . . 82

        1.    As to Silverman and Long . . . . . . . . . . 82
        2.    As to Cleveland . . . . . . . . . . . . . . 86

    C.    Violations of Rule 83.8 . . . . . . . . . . . . 98

    D.    The Court Has Decided Not to Pursue the Possibility
        of Sanctions or Discipline Against Silverman Based
        on Inappropriate Responses in His Application for
        Admission Pro Hac Vice in Triple Tee II . . . . . . 101

VI.  Sanctions and Discipline Being Imposed . . . . . . . . . 105

    A.  As to Gillig . . . . . . . . . . . . . . . . . . . 105
    B.  As to Long . . . . . . . . . . . . . . . . . . . . 107
    C.  As to Silverman . . . . . . . . . . . . . . . . . 109
    D.  As to Cleveland . . . . . . . . . . . . . . . . . 111

I.

## The Backdrop for These Proceedings

Two civil actions previously pending in this court provide the backdrop for these proceedings.

The first, which is referred to as "Triple Tee I," was commenced by a complaint filed in the United States District Court for the Southern District of Florida in January 2004. Triple Tee was the plaintiff. Nike, Inc. ("Nike"), John Thomas Stites III ("Stites"), and Tom Stites & Associates, Inc., were the defendants. The action was transferred from Florida to this court, and randomly assigned to the undersigned's docket, in April 2004. During times relevant to these proceedings, Triple Tee was represented in Triple Tee I by Jonathan T. Suder ("Suder") and Edward E. Casto, Jr. ("Casto") of Fort Worth and Silverman and Long, who apparently were doing business as the firm of Silverman Santucci of Fort Lauderdale, Florida. Silverman and Long each was given pro hac vice status for the representation of Triple Tee. The defendants were represented by

4

Christopher J. Renk ("Renk"), J. Pieter van Es ("van Es") of
Banner & Witcoff, Ltd., of Chicago, Illinois, and Robert Daniel
Martinez ("Martinez") of Fort Worth.  Plaintiff's claims were
dismissed upon grant of Nike's motion for summary judgment, and
entry of a final judgment of dismissal, in August 2007.  The
dismissal was affirmed by the United States Court of Appeals for
the Fifth Circuit in July 2008.  For a more complete description
of Triple Tee I, the court refers the reader to the opinions of
(1) this court reported as <u>Triple Tee Golf, Inc. v. Nike, Inc.</u>,
2005 WL 1639317 (N.D. Tex. July 15, 2005); (2) the Fifth Circuit
reported as <u>Triple Tee Golf, Inc. v. Nike, Inc.</u>, 485 F.3d 253
(5th Cir. 2007); (3) this court reported as <u>Triple Tee Golf, Inc.
v. Nike, Inc.</u>, 497 F. Supp. 2d 827 (N.D. Tex. 2007); (4) this
court reported as <u>Triple Tee Golf, Inc. v. Nike, Inc.</u>, 511 F.
Supp. 2d 676 (N.D. Tex. 2007); and (5) the Fifth Circuit reported
as <u>Triple Tee Golf, Inc. v. Nike, Inc.</u>, 281 F. App'x 368, 2008 WL
2389152 (5th Cir. 2008).

The second action, which is referred to as "Triple Tee II,"
was commenced in October 2008, again in the Southern District of
Florida.  The plaintiffs were Triple Tee and Gillig.  Nike was
the defendant.  While Triple Tee II was pending in Florida,
Gillig and Triple Tee were being represented by Jacqueline Tadros

("Tadros") of Fort Lauderdale, Florida, and Silverman, who was admitted pro hac vice for representation of Gillig and Triple Tee in the Florida court. Nike was represented in Florida by Renk and van Es along with an attorney practicing in Miami, Florida. Upon Nike's motion, Triple Tee II was transferred to this court in December 2008. It was randomly assigned to the docket of the Honorable Terry R. Means. Upon transfer of Triple Tee II from Florida to Texas, Silverman and Tadros continued to be the attorneys for Gillig and Triple Tee. Silverman was granted pro hac vice status for representation of Gillig and Triple Tee in this court by an order Judge Means signed January 8, 2009. Cleveland filed a notice of attorney appearance on behalf of Gillig and Triple Tee on January 23, 2009. In May 2010, Tadros was withdrawn from representation of the plaintiffs. Nike was represented in Triple Tee II after its transfer to Texas by Renk, van Es, and others in their firm, through pro hac vice admissions, and Michael H. Martin of Fort Worth. In February 2009 Judge Means, upon Nike's motion, reassigned Triple Tee II to the docket of the undersigned. In May 2009, the court granted Nike's motion for summary judgment and entered a final judgment dismissing the action. Gillig and Triple Tee appealed to the

United States Court of Appeals for the Federal Circuit,[1] which in April 2010 affirmed in part, reversed in part, and remanded for further proceedings as to inventorship claims that had been added to the litigation in Triple Tee II. The claims asserted by the plaintiffs in Triple Tee II were dismissed with prejudice by a final judgment entered by this court in July 2010, pursuant to a stipulation of dismissal filed by Gillig, Triple Tee, and Nike. For a more complete description of Triple Tee II, the court refers the reader to the opinions of (1) this court reported as Triple Tee Golf, Inc. v. Nike, Inc., 618 F. Supp. 2d 586 (N.D. Tex. 2009), and (2) the Federal Circuit reported as Gillig v. Nike, Inc., 602 F.3d 1354 (Fed. Cir. 2010).

II.

## The Documents at Issue in These Proceedings

The two sets of documents that led to these disciplinary and sanction proceedings were filed in Triple Tee II. The first set was filed in February 2009 by Gillig and Triple Tee, acting through Cleveland and Silverman, and the second in June 2010 by Gillig and Triple Tee, acting through Silverman. Gillig provided his declaration, which bears a signature date of January 22,

---

[1] The Federal Circuit was the proper circuit court of appeals by reason of patent causes of action that were asserted for the first time in Triple Tee II.

2009, as a part of the first set.  Long provided his declaration,
which bears a signature date of June 14, 2010, as a part of the
second set.  Each set contained recitations by the declarant
concerning events occurring during the court's handling of Triple
Tee I.  They were filed for the purpose of preventing the
undersigned from presiding over Triple Tee II--the first set in
an attempt to persuade Judge Means not to reassign Triple Tee II
to the undersigned's docket and the second set to create a record
to support a contention by Gillig and Triple Tee that the
undersigned was disqualified from presiding over Triple Tee II.

A.    The First Set--The Response in Opposition to Nike's
      Motion to Reassign Triple Tee II to the Undersigned,
      and Its Supporting Declaration of Gillig

      After the Florida court transferred Triple Tee II to this
court and it was assigned to Judge Means, Nike filed in December
2008 a motion to reassign the case to the undersigned.  Gillig
and Triple Tee, in a response filed over the signature of
Cleveland and the name of Silverman on February 2, 2009, opposed
the motion to reassign on the ground that "[p]laintiff Gillig
believes that Judge McBryde has exhibited personal and extra-
judicial bias and prejudice against him."  Hr'g Ct. Ex. 1 (Resp.
in No. 4:08-CV-743-A (docket entry 37)) at 1 (internal quotation
marks omitted).  In support of that assertion, Gillig and Triple

8

Tee, through Cleveland and Silverman, invited Judge Means to "*[s]ee* Declaration of John P. Gillig attached [to the response] as Exhibit 'A.'" Id. The main text of the response concluded with the statement that "[i]n considering whether to exercise its discretion to re-assign this case, the Court may wish to consider the testimony of John Gillig who presented the Declaration attached hereto as Exhibit 'A' to the undersigned counsel and asked that it be presented to the Court." Id. at 7-8.

Attached to the response as its Exhibit A was a declaration, bearing this court's caption for Triple Tee II, signed by Gillig, apparently dated January 22, 2009, titled "Declaration of John P. Gillig in Opposition to Nike's Motion to Re-Assign Case to Judge McBryde." Id., Ex. A at 1. Among the statements Gillig declared under penalty of perjury to be true and correct were the following:

> 3. In my opinion, Judge McBryde has exhibited personal and extra-judicial bias and prejudice against me, as is evidenced by the foregoing.
>
> 4. At a status conference which I believed occurred July 15, 2004, during the predecessor proceeding, I was present at a conference in offices of Judge McBryde's and, in particular, at the Federal Courthouse at Fort Worth. The room appeared substantially as I have sketched in Exh. A herewith. As may be noted therefrom, I was seated toward the rear of the room in the guest or "non-attorney" area while my attorneys Tracy Long, Jon Suder another lawyer from

the Suder firm were seated at the right of the conference table, while the lead attorney for Nike, Chris Renk, sat substantially opposite to Tracy Long at the left side of the table. The other Nike lawyers also sat at the left of the table.

5. Before the start of the status conference, Judge McBryde walked from a hallway into the room through the indicated doorway at the back of the room and, while standing at Location 1, turned to me and said "You cannot afford to be in this court" and then, as he walked around the conference room along the path showed by the dotted lines in my sketch of Exh. A, stopped at Location 2 and asked my attorneys if they had taken the case on a contingency basis and that, if so, they "should not expect to get a house out of this case." After I heard him say this, Judge McBryde continued this line of comment as he walked from Location 2 to Location 3 in the conference room and, as he was starting to take his seat at Location 3, I heard him remark that the case would "never make it to his courtroom."

6. At that time in 2004 I did not understand what Judge McBryde meant, given that I had never met him before and had no knowledge of his record on the bench.

7. At a hearing that I believed occurred on July 6, 2005, Judge McBryde threatened to hold my lawyers and myself in contempt if we did not submit a revised document, in language meeting with his approval, by the afternoon of the following day.

8. On a later occasion, also during the predecessor proceeding, which I believe was at a pretrial conference held July 5,2007, Judge McBryde remarked upon the opinion of the Fifth Circuit Court of Appeals [DE 199/200] and said, in so many words, that he was less than happy with the opinion of the Circuit and was still looking for a way to dispose of this case, apart from trying it, but that he had not yet found one.

9.    Shortly thereafter, on July 18, 2007, I testified as corporate representative for TTG relative to the issue of standing.  At said hearing, and after Judge McBryde had asked me several questions relative to the formation of TTG and the manner of my asserted assignment of trade secrets to TTG, Judge McBryde briefly left the courtroom and then, upon returning, but before reaching the bench, told me that he did not believe anything that I had said.

Id., Ex. A at 1-3.[2]

The evidence has shown that virtually everything said in paragraphs 3-5 and 7-9 of Gillig's declaration is false.

B.    The Second Set--Plaintiffs' Motion to Recuse, and Its Supporting Declaration of Long

On June 17, 2010, Gillig and Triple Tee, acting through Silverman, filed a motion to recuse the undersigned in Triple Tee II.  The motion was filed approximately two weeks after the Federal Circuit issued its mandate affirming in part, reversing in part, and remanding Triple Tee to this court for further proceedings.  The motion requested the undersigned recuse himself from Triple Tee II, giving as reasons for the request that:

Judge McBryde's overt personal bias against Gillig negates his impartiality in any case in which Gillig might appear as a witness or party.  A reasonable

---

[2]Paragraph 1 of Gillig's declaration recites that Triple Tee II "was recently transferred to this Division of this District pursuant to the Order of Exhibit 1 of the Defendant's Appendix of Evidence in support of its present motion." Hr'g Ct. Ex. 1 (Resp. in No. 4:08-CV-743-A (docket entry 37)), Ex. A at 1. The "Exhibit 1" to which the declaration refers is a copy of the December 12, 2008, order of the Southern District of Florida granting Nike's motion to transfer Triple Tee II to this court.  Nike's Mot. to Reassign in No. 4:08-CV-743-A, APP (docket entry 28) at 1-12.

person would conclude that Judge McBryde's ability to
preside over this matter in particular, in which Gillig
is a party and a central witness, in an impartial
manner might reasonably be questioned.

Judge McBryde cannot reasonably be expected to
preside over this matter in an impartial manner and he
should therefore recuse himself pursuant to 28 USC
§455(a) and §455(b)(1).

Hr'g Ct. Ex. 2 (Mot. to Recuse in No. 4:08-CV-743-A (docket entry

84)) at 8.

Accompanying the motion to recuse was a declaration by Long,

bearing the caption of Triple Tee II, in which he declared under

penalty of perjury to be true and correct almost verbatim things

Gillig said in his January 22, 2009, declaration, except that

Long said that the things Gillig declared occurred at a status

conference on July 15, 2004, happened, instead, on July 6, 2005,

at the pretrial conference Gillig mentioned in paragraph 7 of his

declaration. Long declared:

5. I was present at a July 6, 2005 Pretrial
Conference before Judge McBryde in the predecessor
action TTG I.

6. I was present in a conference room and sat at
counsel's table across from Mr. Renk, one of Nike's
attorneys, as illustrated in the accompanying drawing
of Exhibit A.

7. In addition to myself, present in the room
were Christopher Renk, Robert Martinez, Pieter van Es,
Jonathan Suder, Ed Casto, John ("Jack") P. Gillig,

Thomas Stites, Cindy Dunn, as well as the Court's staff.

      8.  Before the conference started and went on the record, I heard Judge McBryde say to John P. Gillig, while standing at Location 1 as indicated on the accompanying Exhibit A, "You cannot afford to be in this court."  In addition, Judge McBryde remarked to Mr. Suder, when at Location 2 on the accompanying Exhibit A, "You should not expect to get a house out of this case."

      9.  I further heard Judge McBryde say, "This case will never make it to my courtroom".  He said this as he started to take his seat at the head of the conference table at Location 3, as noted on the accompanying Exhibit A.

      10.  I was present at counsel's table and specifically recall the aforementioned comments.

Id., Long Decl. at 1-2.  The "Exhibit A" attached to Long's

declaration is a machine copy of the diagram that was attached as

Exhibit A to Gillig's declaration.  The evidence has shown that

the recitations in Long's declaration of movements the

undersigned made and things the undersigned said at a pretrial

conference on July 6, 2005, are false.

The Long declaration was mentioned in paragraph 6 of the

motion to recuse in the reference "[s]ee the declaration of S.

Tracy Long, attached herein as Exhibit A."  Id. at 2.[3]

---

[3]The reference in paragraph 6 of the motion to recuse to the declaration of Long "attached herein as Exhibit A" appears to be incorrect.  The Long declaration does not bear an exhibit number.  The item

(continued...)

III.

**Events in Triple Tee I and Triple Tee II
That Provide (1) Context for Testimony and
Exhibits Received at the Hearing Conducted in
These Proceedings and (2) the Motivations for the
Filing of the Gillig and Long Declarations**

During the hearing conducted in these proceedings on October 27-28, 2010, several events that occurred during the pendency of Triple Tee I or Triple Tee II were mentioned. The court is giving under this heading a brief description of the most significant of those events to provide both (1) context for the summary that is provided in section IV of this memorandum opinion of the evidence received at the hearing and (2) insight into the motivations Triple Tee, Gillig, and their attorneys had for taking the extreme measures they took to try to prevent the undersigned from presiding over Triple Tee II.

1. **The July 6, 2005, Pretrial Conference in Triple Tee I**

The first hearing or conference held at the courthouse in Triple Tee I was the pretrial conference conducted July 6, 2005. Docket entry 163 in No. 4:04-CV-302-A. In attendance were Suder, Long, Casto, Renk, van Es, and Martinez, as attorneys, other

―――――――――――――――

[3](...continued)
under tab A to the motion is the diagram referred to in the Long declaration as Exhibit A to the declaration.

personnel from Suder's office, and Stites and Gillig. Before entering the conference room on July 6, 2005, the undersigned had never seen Gillig, Stites, Renk, van Es, and some of the others who were present, and had no way of knowing the identities of any of those persons. The transcript of the July 6, 2005, conference shows that near the beginning of the conference, after three of the attorneys representing Triple Tee were identified, the court jokingly commented that he hoped that they were "doing this on a contingent fee basis because [the plaintiff] will be broke before long if you're not." Hr'g Kirkley Ex. 2 (Tr. of July 6, 2005 Proceeding, in No. 4:04-CV-302-A (docket entry 173)) at 4.

The only thing said by the undersigned during the pretrial conference about the parties doing something the afternoon of the following day was the following exchange:

THE COURT:  . . . .

        I think that's all I have.  I would like for you to have -- it may be pushing it to say this afternoon, but I would like for you to have a revised pretrial order -- I think I said 3:00 o'clock?

        MR. RENK:  I think that's what you said.

        THE COURT:  That may be pushing it.  Would you like until sometime tomorrow?

        MR. SUDER:  Yes, Your Honor.

THE COURT:  Why don't we do it by 2:00 o'clock
tomorrow.

MR. RENK:  Yes, sir.

THE COURT:  Is there a question any of you have?
(No response.)

Id. at 61-62.  No mention was made during the pretrial conference
of anyone being held in contempt for anything.

2.    Events Related to the First Grant of Summary
      Judgment in Triple Tee I

On July 13, 2005, the court granted a motion for summary
judgment the defendants had filed in Triple Tee I, dismissing all
claims of Triple Tee.  On October 11, 2005, after Triple Tee had
filed a notice of appeal to the Fifth Circuit from the judgment
of dismissal, Triple Tee filed a motion in this court seeking
relief from the judgment of dismissal and a motion for sanctions
against the defendants, contending that the defendants
intentionally withheld from discovery served by Triple Tee on the
defendants disclosure of two patent applications that were
important to the litigation and that would have prevented grant
of summary judgment.  In November 2005, this court denied the
motion for relief from judgment, following which Triple Tee
appealed the denial order to the Fifth Circuit, to be considered
along with its appeal from the July 2005 judgment dismissing

Triple Tee's claims. The April 2007 ruling of the Fifth Circuit, which included a reversal and remand, was based in large part on the Fifth Circuit's conclusion that this court erred reversibly in denying Triple Tee's October 2005 motion for relief from final judgment. <u>Triple Tee Golf, Inc. v. Nike, Inc.</u>, 485 F.3d 253, 267-69 (5th Cir. 2007).

After the case was returned by the Fifth Circuit to this court, this court revisited Triple Tee's contention that defendants had withheld information in their discovery responses about two patent applications. The matter was brought before the court again by a motion of Triple Tee for leave to supplement the report of an expert witness with opinions as to one of the allegedly non-disclosed patent applications. From evidence presented to the court in connection with Nike's opposition to the motion for leave, the court learned that Triple Tee and its counsel had misrepresented to this court in their October 2005 motion for relief from final judgment that Triple Tee was not aware of either of the allegedly non-disclosed patent applications before the July 2005 judgment of dismissal, and that Triple Tee and its counsel also had made misrepresentations to the Fifth Circuit on that subject, which very likely had an influence on the Fifth Circuit's decision to reverse in part and

remand.  See Triple Tee Golf, Inc. v. Nike, Inc., 497 F. Supp. 2d 827, 830-33 (N.D. Tex. 2007).  Included in the material the court found to be misleading was a declaration of Gillig.  Id. at 831.

### 3.  The July 5, 2007, Pretrial Conference in Triple Tee I

Following the partial reversal and remand by the Fifth Circuit, another pretrial conference was held in Triple Tee I on July 5, 2007.  During that conference the court learned that Triple Tee apparently had made false allegations in the original complaint and each of its amended complaints concerning ownership by it through Gillig of the subject matter of the litigation. Tr. of July 5, 2007, Hr'g in No. 4:04-CV-302-A (docket entry 256) at 31-33, 42-47, 48-50, 64, 70-71, 77-78.  The issue of whether Triple Tee, Gillig, and their counsel were honest in claiming that an assignment had been made was a decisive factor in the final dismissal of Triple Tee's claims in Triple Tee I.

### 4.  The July 10, 2007, Telephone Conference

During a telephone conference conducted in Triple Tee I on July 10, 2007, with Suder, Casto, and another attorney from their firm on the line for Triple Tee, and van Es, Martinez, and another attorney on the line for defendants, the court discussed with the attorneys the possibility of settlement.  Hr'g Kirkley

18

Ex. 3 (Tr. of July 10, 2007, Tel. Conf. in No. 4:04-CV-302-A (docket entry 235)) at 12-21. With the intent of reminding the attorneys of the risks of trial and encouraging the parties to seriously consider settlement, the court (1) pointed out to counsel for the defendants the probable cost of the litigation, id. at 15; (2) commented to Suder that he should reevaluate any thought that he might get a home in Florida or a ski lodge in Colorado out of the case, id.; (3) discussed that counsel for Triple Tee were proceeding on a contingent-fee basis, id. at 15-16; (4) noted for the benefit of counsel for the defendants that the court could well be wrong on many of the issues that previously had been discussed favorably to the defendants, id. at 16; and (5) noted to the defendants that they needed to reconsider any thought they may have that they might win the case outright before a trial, bearing in mind that the Fifth Circuit had ordered the court to hold a trial upon remand and that the court had not "figured out a way to get around that yet," id. at 16-18.[4]

---

[4]Triple Tee and its counsel, Suder and Silverman, in their Fifth Circuit briefs took the language used by the court during the court's attempt to encourage settlement so out of context that they, in effect, misrepresented to the Fifth Circuit what the undersigned meant. Nike's Br. in Opp'n to Pls.' Mot. to Recuse in No. 4:08-CV-743-A, APP (docket entry 89) at 106, 108-09.

5.  The Taking of Evidence in Triple Tee I in the
    Courtroom on July 18, 2007

On July 18, 2007, testimony was taken from Gillig at a
hearing in the courtroom.  Suder and Long were present as
attorneys for Triple Tee, and Renk, Martinez, and another
attorney were present as attorneys for the defendants.  After
having heard Gillig's testimony in support of his and Triple
Tee's contention that Gillig had made an assignment of his trade
secrets to Triple Tee, the court made a finding on the record
that "it's an absolute fabrication that there was an assignment."
Tr. of July 18, 2007, Proceedings in No. 4:04-CV-302-A (docket
entry 258) at 70.  During a discussion of the motion to
supplement the expert's disclosure, mentioned supra at 17-18, the
court made known to counsel for Triple Tee that the court, at
least tentatively, had concluded that Triple Tee and its counsel
had made false representations to the court in an effort to
induce the court to set aside the June 2005 judgment of
dismissal, and had made similar false representations to the
Fifth Circuit to persuade it to reverse this court's judgment of
dismissal on the ground that this court should have granted
Triple Tee's motion for relief from final judgment due to the
alleged non-disclosure of patent applications.  Id. at 63-68.

Near the end of the July 18 hearing, the undersigned left the bench, and then returned one minute later, stating upon return that the court had another question or two he wanted to ask Gillig. Gillig was invited back to the witness stand, and additional questions were posed to him. Nothing was said off the record to Gillig when the undersigned returned to the bench.

6.    <u>Findings Expressed by the Court in the Memorandum Opinion and Order Finally Dismissing Triple Tee I</u>

In the memorandum opinion and order the court signed August 10, 2007, finally dismissing Triple Tee I, the court made several judicial findings that questioned the credibility of Gillig. The court found that (1) "plaintiff's contention that it had a right to bring this action through assignment from Gillig is a fabrication," <u>Triple Tee Golf, Inc. v. Nike, Inc.</u>, 511 F. Supp. 2d 676, 691 (N.D. Tex. 2007); (2) "[n]o reasonable fact finder would give Gillig's testimony concerning a purported assignment any credibility considering the discrepancies in the things he said from time to time," <u>id.</u> at 693; and (3) "[n]o rational fact finder would give any credence to a witness who played a shell game such as Gillig did on the assignment subject," <u>id.</u>

In addition, the court judicially questioned the truthfulness of a declaration made by Gillig that Triple Tee's

attorneys had filed in support of their contention that Gillig
had assigned to Triple Tee his trade secrets and his right to sue
for damages arising from misappropriation or other wrongful use
of Gillig's trade secrets.  Id. at 693, 698-99.  Implicit in the
findings in the August 10, 2007, memorandum opinion was a finding
that the facts stated in Gillig's declaration were false.

     7.    <u>Gillig and Triple Tee's Opposition to Nike's
            Motion to Transfer Triple Tee II from Florida
            to the Docket of the Undersigned, and the
            Gillig Declaration Filed in Support of the
            Opposition</u>

In November 2008 Nike filed its motion, with a supporting
memorandum, asking that Triple Tee II be transferred from the
Southern District of Florida to the Northern District of Texas so
that the undersigned could preside over it.  Nike's Mot. to
Transfer & Supp. Mem. in No. 4:08-CV-743-A (docket entries 8 &
9).  The motion was specific that its request was to transfer
"this action to the Northern District of Texas, Fort Worth
Division, so that it can be assigned to Judge McBryde."  Hr'g Ct.
Ex. 3 (Nike's Mot. to Transfer in No. 4:08-CV-743-A (docket entry
8)) at 1.

In December 2008 Gillig and Triple Tee filed an extensive
memorandum in opposition to Nike's motion to transfer.  Hr'g Ct.
Ex. 4 (Pls.' Mem. in Opp'n in No. 4:08-CV-743-A (docket entry

17)).  The memorandum in opposition was supported by a
declaration made by Gillig on December 3, 2008 (during the month
before he made the January 2009 declaration that is one of the
subjects of these disciplinary and sanction proceedings).  There
is no mention in Gillig's December 2008 declaration, or in any
other part of the opposition filed by the attorneys for Triple
Tee and Gillig, of any contention by Triple Tee and Gillig that
the undersigned had any bias or prejudice against either of them
or that the undersigned had said or done any of the things
attributed to him in the later-filed Gillig and Long
declarations.  No suggestion was made in the memorandum or in
Gillig's supporting declaration that any attitude or conduct on
the part of the undersigned was a reason why the case should not
be transferred from Florida to the undersigned.  Tadros and
Silverman were the attorneys who filed the opposition.

     8.    <u>The Order of the Florida Judge Granting
            Nike's Motion to Transfer</u>

The order the Florida judge signed December 12, 2008,
transferring Triple Tee II from Florida to this court addressed
the arguments the parties had made for and against the transfer.
Dec. 12, 2008, Order in No. 4:08-CV-743-A (docket entry 19).  No
mention is made in the order of any contention by Gillig or

23

Triple Tee that the case should not be transferred due to any kind of bias or prejudice displayed against either of them by the undersigned, or that the undersigned had said or done any of the things attributed to him in the Gillig and Long declarations at issue here. Not until after Triple Tee II was transferred from Florida to this court and randomly assigned to Judge Means, and Nike had moved for reassignment of the case to the undersigned, did Triple Tee and Gillig and their attorneys contend that bias or prejudice on the part of the undersigned against one or both of them was a factor to be considered in deciding whether the undersigned should preside over Triple Tee II.

9.  The Declarations of Renk, van Es, and Martinez
    Filed by Nike in Triple Tee II in Support of Its
    Motion to Reassign the Case to the Undersigned

With Nike's reply to the response of Gillig and Triple Tee in opposition to Nike's motion asking Judge Means to reassign Triple Tee II from Judge Means's docket to the undersigned's, Nike filed declarations of Renk, van Es, and Martinez. Hr'g Ct. Ex. 5 (Nike's Reply in No. 4:08-CV-743-Y, APP (docket entry 39)) at APP 1-6. Nike's reply and the declarations were prepared on the generous assumption that when Gillig referred in his January 22, 2009, declaration to a conference in the offices of the undersigned on July 15, 2004, he could have been referring to the

pretrial conference that was conducted July 6, 2005, inasmuch as there was no conference in Triple Tee I in July 2004.

Each of the declarants declared under penalty of perjury that (1) he appeared at the July 6, 2005, pretrial conference in Triple Tee I; (2) the July 6, 2005, conference was the first time in Triple Tee I that the parties and counsel appeared in person before Judge McBryde; (3) he had not seen the undersigned prior to that conference; (4) he was present in the conference room seated at counsel's table not more than fifteen feet away from Gillig (in the case of Renk) and eight feet away from Gillig (in the cases of van Es and Martinez) when the undersigned entered the room, id. at APP-1, 3, 5; (5) the persons present in the room were Renk, Martinez, van Es, Suder, Long, Casto, Gillig, Stites, Cindy Dunn ("Dunn"), and the court's staff, id. at APP-2, 4, 6; (6) the three people, other than the court's staff, present in the conference room who were not seated at the counsel table were Stites, Gillig, and Dunn, id.; (7) he did not hear or see the undersigned say anything to Gillig or counsel before the proceedings began on the record, id.; (8) had the undersigned said anything to Gillig when the undersigned walked by Gillig he would have heard or at least noticed that, and would have remembered such an event, id.; (9) he did not hear the

undersigned say at any time to any person that "you cannot afford to be in this court," or that the case would "never make it to his courtroom"; and (10) had the undersigned made any such comment, he would have remembered it, id.

> ### 10. The Order Granting Nike's Motion to Reassign Triple Tee II

Judge Means granted Nike's motion to reassign Triple Tee II to the docket of the undersigned by order issued February 11, 2009. Order Granting Mot. to Reassign in No. 4:08-CV-743-A (docket entry 43). Judge Means made the following findings concerning the contention of Gillig and Triple Tee that the undersigned had shown bias or prejudice against them as parties:

> Gillig and Triple Tee respond that this Court should not reassign the second suit because Judge McBryde has shown bias or prejudice against them as parties. The evidence and arguments proffered by Gillig and Triple Tee seem to assert that because Judge McBryde previously ruled against them on the merits, the case should not be reassigned. This is insufficient to overcome Nike's compelling arguments in favor of transfer to Judge McBryde and does not show that Judge McBryde could not or should not preside over the second suit as he did over the first suit.

Id. at 2.

11.    The Supplemental Declaration of Gillig
       Proposed for Filing in Opposition to Nike's
       Motion to Reassign Triple Tee II

Before Judge Means issued his reassignment order, Cleveland, Tadros, and Silverman were considering the filing of a supplemental declaration of Gillig in opposition to Nike's motion to reassign Triple Tee II to the undersigned.  Hr'g Cleveland Ex. 15 at APP-235-237.  Of interest, although by then those attorneys had received the declarations of the Nike attorneys establishing that even if Gillig had intended to refer in his declaration to the July 6, 2005, pretrial conference instead of something that occurred on July 15, 2004, his declaration of things the undersigned said and did at the conference would be false, the only correction the proposed supplemental declaration would have made in Gillig's January 22, 2009, declaration would be to say that the date July 15, 2004, referenced in the first declaration was an error, and that the correct date was July 6, 2005.  Id. at 236.  In addition, the proposed supplemental declaration had Gillig providing as support for the things he previously had declared the undersigned said on July 15, 2004, out-of-context excerpts from the settlement discussions in which the undersigned and counsel had engaged during the July 10, 2007, telephone conference in Triple Tee I.  Id. at 236-37.

IV.

<u>Summary of the Evidence Received at the
October 27-28 Hearing</u>

Pursuant to an order entered in this miscellaneous action on
September 10, 2010, a hearing was conducted commencing the
morning of October 27, 2010.  By the same order, the court
appointed Lyndell Kirkley ("Kirkley"), a member of the bar of
this court, to assist the court in the handling of the
proceedings, and the court informed the parties that the court
was taking judicial notice in connection with the matters to be
considered at the hearing all proceedings held, and papers filed,
in Triple Tee I and Triple Tee II, including all proceedings and
papers filed in either of those cases before transfer to the
docket of the undersigned, and any appeal taken from any rulings
made in either of those cases.  Sept. 10, 2010, Order in No.
4:10-MC-018-A (docket entry 1).

Cleveland was represented at the hearing by Stephen L. Tatum
("Tatum").  Long represented himself.  Silverman appeared at the
hearing on his own behalf and as counsel for Gillig and Triple
Tee.  The witnesses who testified were Terri West ("West"), an
interior designer who had prepared at Kirkley's request a scale
drawing of the conference room where the July 6, 2005, pretrial

conference was conducted; Gillig; Martinez, Suder, Dunn, William Taylor ("Taylor"), Renk, Stites, and Casto, all of whom were in the conference room during the July 6, 2005, pretrial conference; Silverman; Long; and Cleveland.

The questioning of the witnesses at the hearing was for the most part on the doubtful assumption that when Gillig made reference in paragraph 4 in his January 22, 2009, declaration to a status conference that he "believed occurred July 15, 2004," supra at 9, he meant to refer to the July 6, 2005, hearing he mentioned in paragraph 7 of his declaration.[5]

Briefly, the witnesses testified as follows:[6]

A.    West

West identified Kirkley Exhibit 1A as a scale drawing of the room where the July 6, 2005, conference was held.

---

[5]The court uses the phrase "doubtful assumption" because the text of the Gillig declaration makes clear that Gillig intended to refer to entirely separate and distinct events when he described in paragraphs 4 and 5 things that happened on what he declared he believed was July 15, 2004, at a status conference and then separately describes in paragraph 7 something he declared he believed happened at a hearing held on July 6, 2005.

[6]The court is not purporting to include in the summaries everything the witnesses said, but the court has taken into account all testimony of all witnesses in making the findings and reaching the conclusions expressed in this memorandum opinion and order.

B.   Gillig

Gillig's testimony was difficult to follow, and often was self-contradictory.  After listening to the testimony, and watching Gillig on the stand, the court concludes that little credibility can be given to the things he said.

He described how his January 22, 2009, declaration came into existence by saying that he prepared a lot of it in handwriting, then someone put it in final form, and when he got back the finished product, it seemed okay to him.  In describing the role of his attorneys, he explained:

> *THE WITNESS:*  Well, when I talked to Mr. Cleveland, we were out here, Mel and -- Mel Silverman, we were all out here.  The issue came up. Nobody suggested it was a bad idea.  Mr. Cleveland was very willing to go ahead and do it.  He was being paid hourly.  There was no reason for him not to draw it up. So nobody told me I shouldn't file this or anything, that I know of, so I went along with my attorneys and we filed it.
>
> *THE COURT:*  When you say your attorneys, who are you referring to?

*THE WITNESS:* Mr. Cleveland and Mr. Silverman.

Hr'g Tr., Vol. 1 at 33.[7] As to how the subject of what he had

heard came up, the following exchange occurred:

>        THE COURT: Okay. And how did the subject of what
> you heard come up?
>
>        . . . .
>
>        *THE WITNESS:* It came up in discussions, that it
> wasn't felt that  you were proceeding properly, and
> that -- that the only way to try to get this to another
> Judge to where we felt we had a fair shake was to
> recuse you because you were not performing properly.
>
>        *THE COURT:* And that's why you made that
> declaration?
>
>        *THE WITNESS:* Absolutely. I do feel that my
> Constitutional rights had been offended, yeah.

Id. at 34.

When asked to be specific about who provided the dates that

were used in his declaration, he said that the attorneys provided

the dates, and then he said, in effect, that he and Silverman

together went through transcripts to find information that they

could use in the declaration and that the text of the declaration

---

[7]On cross-examination, Gillig gave an answer, when he was being asked about Cleveland's
involvement in Gillig's January 22, 2009, declaration, that indicates that at one point Cleveland did not
want to sign the document and wanted Silverman to sign it. Hr'g Tr., Vol. 1 at 131. "I talked on the
phone with [Cleveland], correspondence that went back and forth, and to the fact at that point that he said
he didn't want to sign it and that he wanted Silverman to sign it." Id.

31

was the product of collaboration between him and his attorneys.

The following exchange occurred:

> *Q.* You say you went by the dates provided. Who
> provided you with the dates?
>
> *A.* Well, the attorneys. We talked about a meeting.
> They said, this was the meeting at this date, and we
> would read the transcripts and we go through and I go,
> there it is, yeah. And to the best of my knowledge,
> this is where it happened.
>
> *Q.* I would like to be a little more detailed. Which
> lawyer provided you with the dates for what went into
> that affidavit -- I mean, declaration, excuse me?
>
> *A.* Well, it's a collaboration between attorneys. I
> don't know which ones put which words in. They all
> write it and they do it. Now, this over here is -- I
> wrote this up and then apparently at some point I saw
> some writings that supported that, and right offhand, I
> don't remember where they are or where I saw them.
>
> *Q.* . . . . Are you telling us that in this
> declaration that you attached to the opposition to
> Nike's brief to reassign the case to Judge McBryde, are
> you saying that Mr. Silverman helped you write this and
> look up the information that goes into it?
>
> *A.* Well, we found some of the things together. I would
> go read it, find it, say, here, I found some
> information, we would put it in. Now, to the best of
> my knowledge, those are all accurate.
>
> *Q.* Again, my question: Did Mr. Silverman help you
> look for information to go into this declaration?
>
> *A.* Yeah, I suspect he looked through some of this,
> yes, and we discussed it, yeah.

<u>Id.</u> at 63-64.

At one point in his testimony, Gillig said that he does not know when Judge McBryde[8] threatened to hold his lawyers in contempt, giving the following convoluted explanation:

> A. I know that the things I said that I heard him say,
> I know they occurred. Now, what day they happened on, I
> don't know. This is five, six, seven years ago. You
> know, this is all stretched out over eight years. The
> whole thing is a blur. And to be honest with you, I
> don't understand any of it. I don't understand
> anything you've done here over the last eight years,
> you know, so I'm just kind of -- I'm floating around in
> the ocean here getting kicked around and I'm just going
> to see where I end up at the end. You know, I heard
> what the man said, and that's all I know. You can beat
> on me for the rest of your life, please.
>
> Q. I just would like for you to tell me the truth and
> --
>
> A. I am. I read that stuff. I saw it. I heard him
> say these things. I put it in my declaration, and
> that's the end of it.
>
> Q. Did Mr. Cleveland tell you that he had looked over
> the record in this case and could not find a
> verification of some of the things you were putting in
> there as far as dates are concerned?
>
> A. The dates in those things, you know, those are put
> in by the attorneys, the dates and this and that, and
> you can talk to them about that. You know, I've given
> you the best answer I can, is that there was a mistake
> on the date. Other than that, I don't have a clue.
>
> Q. You just told me something different than what I
> understood you to say before. You told me the attorneys

_____

[8]The undersigned refers to himself in the third person in describing the testimony of the witnesses so that the description will be consistent with what the witnesses actually said.

33

put the dates in there.  I understood you to say that
you did it on your best recollection and you put them
in there?

A.  When I signed it, apparently I put them in.  At
some point it says I put them in, okay.  The dates were
there.  I assumed they were correct. I signed it,
therefore, now I'm saying it.  And as far as I'm
concerned, it's a mistake.  And if you want to beat me
all day on a mistake, go ahead.  Let's waste our time.

Id. at 76-77.

Gillig admitted that the first time Judge McBryde ever saw

him was when Judge McBryde entered the conference room.  He gave

no explanation as to how Judge McBryde would have recognized who

he was to make a comment specifically to him.  About the only

things that are clear from Gillig's testimony are that he and his

attorneys made up their minds that they did not want the

undersigned to preside over Triple Tee II, and they were anxious

to do whatever they could do to keep Gillig's ongoing dispute

with Nike in the hands of another judge.  The impression one

gains from Gillig's testimony is that he, in cooperation with

Silverman and, possibly, Cleveland, went through the transcripts,

and selected from the reported and transcribed parts of

proceedings things that the undersigned said on the record that

might be used to provide support for the fictitious things Gillig

said in his declaration happened off the record at a nonexistent July 15, 2004, status conference.

Gillig, Silverman, and Cleveland discussed "the recusal of Mr. McBryde" as they were working on his declaration. Id. at 38, 64-66, 101, 103. He testified that the decision for him to make a declaration "would have been right at the time we decided that we should recuse [Judge McBryde]." Id. at 67.

Gillig testified that they did as much as they could to prevent the transfer of Triple Tee II from Florida to Texas. One of the reasons he thought Triple Tee II should not be transferred from Florida to Texas was because Judge McBryde was biased and prejudiced against him and his company. Immediately after he met Tadros, one of the attorneys who represented him in Triple Tee II while it was pending in Florida, he told her Judge McBryde was biased and prejudiced against him and his company and told her of the things he claims Judge McBryde said at the conference, and Tadros responded that a judge should not say those things. Tadros told him that she felt that a judge saying those things should recuse himself.

When Nike requested that Triple Tee II be transferred from Florida to Fort Worth to be assigned to Judge McBryde, he worked with Silverman and Tadros to try to persuade the court in Florida

not to make the transfer. Yet, the declaration he signed for use in opposing Nike's request to transfer the case from Florida to Judge McBryde did not say anything that would suggest that Judge McBryde was biased or prejudiced in any respect against him or his company, nor did the declaration make any reference to anything Judge McBryde said at any time, nor did it relate any facts that would suggest that Gillig would not receive a completely fair and impartial trial if his case were to be tried before Judge McBryde. He signed that declaration on December 3, 2008. The lawyers who filed that Florida declaration for him in the Florida court were Tadros and Silverman. When he was asked why nothing was said in his December 2008 declaration filed in the Florida court to indicate that Judge McBryde had, or has, some bias or prejudice against him or Triple Tee, he gave the following puzzling explanation:

> *THE WITNESS:* Well, most likely it would be why go into a can of worms when hopefully the Court would just see that it should come to Florida. And at that point, it wasn't a step that I would want to take at that point.
>
> . . . .
>
> *THE WITNESS:* It's not a step I wanted to take at that point. It's just that we felt maybe we could get into the Florida court where it should be, and we could

be there without taking that other step, as far as I could tell you.

Id. at 123.

Equally puzzling is Gillig's testimony that he was first asked to give a declaration or statement related to the things that he discussed in his January 22, 2009, declaration somewhere around the end of Triple Tee I and the beginning of Triple Tee II. Then he gave the following explanation as to why no action was taken to try to cause Judge McBryde to be disqualified before it was:

> THE WITNESS: Well, the best I could answer that is that that would be a last result thing that you would try to do with a judge, okay, because apparently I'm learning there's going to be some repercussion on this, so we would use that as a last thing you would possibly do. That's my contention. You know, we were hoping that the case would move forward, you know, but --

> . . . .

> THE WITNESS: It's not something you take lightly.

Id. at 133-34.

Elaborating on what he said in paragraph 9 of his declaration concerning an event that occurred during a hearing conducted January 18, 2007, Gillig testified:

> THE WITNESS: . . .

> . . . .

Another time you left the courtroom and you came
barging back into the courtroom yelling I don't believe
anything you say.  That was another reason I decided
that we should recuse you because you said that you
don't believe anything I say.

Well, that means you don't believe anything I say
right now because anything is anything.

*THE COURT:*  Are you saying that happened during
the first Triple Tee case?

*THE WITNESS:* It was one of the times -- the only
time we actually got physically into your courtroom,
and you walked out the door over there, and then after
you came right back in afterwards and you said, I don't
believe anything you say, and then you went right back
out the door and that was that.

Id. at 135.

C.    Martinez

Martinez is the Fort Worth attorney who participated in the

representation of Nike in Triple Tee I and was present at the

July 6, 2005, pretrial conference.  Referring to the Exhibit A

diagram attached to Gillig's declaration, he said that he does

not recall Judge McBryde walking the path shown on the diagram

from the entrance into the conference room to the place where the

judge was seated.  Instead, the judge took the most direct path

from the doorway to his seat, which would have been a path on the

opposite side of the table from the path shown on Exhibit A.

Everyone was standing when Judge McBryde entered the room and

went to his seat. He recalls that as the judge was going from the entry door to his seat, the judge passed behind the chair he had been seated in, and he turned toward Judge McBryde as the judge walked behind his chair so that his back would not be to the judge. When Judge McBryde entered the conference room, it became very quiet. He did not hear the judge say anything to anyone from the time he entered the room until he took his seat. Martinez was paying attention, and was alert to everything that was happening in the room.

He is aware of what Gillig declared Judge McBryde said as he entered a conference room. Judge McBryde absolutely did not make any of those statements. Judge McBryde did not show disrespect for anyone during the conference. He is unaware of anything that would have allowed the judge when he entered the room to know which person in the room was Gillig.

D.    Suder

Suder is one of the Fort Worth attorneys who was present at the July 6, 2005, pretrial conference on behalf of Triple Tee. He terminated his representation of Triple Tee shortly after the Fifth Circuit affirmed this court's dismissal of Triple Tee I.

He is aware of Gillig's declaration and its Exhibit A. The exhibit incorrectly shows where he was seated. He was seated

directly across the table from Renk. Judge McBryde did not say anything to Suder as the judge walked from the entrance door to his seat. He cannot recall exactly which path Judge McBryde took, but he believes it would have been on the opposite side of the table from what is shown on Gillig's Exhibit A diagram. That would be the way Judge McBryde normally would walk into the room. He thinks he would have remembered if the judge had walked behind him, as shown on the Exhibit A diagram, instead of going on the other side of the table. As well as he can recall, the judge walked behind the Nike lawyers to reach the end of the table.

He was listening and paying attention when the judge came into the room. It would have been his objective to listen carefully and hear anything that Judge McBryde would say once entering the room. He does not recall that the judge said anything to Gillig, and believes that he would have remembered it if he had done so. He explains, "I find it at odds with my recollection that the Judge would have singled Mr. Gillig out, knowing it was him, and made a statement to him." Id. at 153. Suder does not recall Judge McBryde making any statement to him during the July 6, 2005, pretrial conference about getting a house out of the case. Judge McBryde did make a comment to that effect during a telephone conference approximately two years

after the Fifth Circuit had remanded the case, a comment that was made relative to settlement. He was pleased to hear the comments Judge McBryde made during that telephone conference. He did not take any comment Judge McBryde made as indicating any bias or prejudice on Judge McBryde's part. Rather, he took the comments as having been made jokingly to get the conversation started about settlement.

Had anyone wanted his files concerning Triple Tee I after he terminated his representation of Triple Tee, they could have had them upon request. He did not receive a call from Gillig, Silverman, or Cleveland before the Gillig declaration was filed in opposition to Nike's motion to move the case to Judge McBryde. They did not call and ask him what his recollection was of July 6, 2005, and the events that occurred at the pretrial conference. Long did not call to ask him anything about the Gillig declaration or the plat that was attached to it. He has not had any conversation with Silverman since he terminated his employment with Triple Tee. He has spoken to Gillig once, and it was just very cordial and short, and there was no discussion on any merits whatsoever. He spoke to Cleveland after the fact, and it may have been after Triple Tee II was already transferred and after Cleveland was already out of the case. He remembers that

it was "after everything was filed." Id. at 160. His understanding is that Cleveland attempted to call him, and they did talk briefly about the case. He believes it was even after Cleveland had withdrawn from the case.

He did not know anything about Long's declaration or the specifics of Gillig's declaration until sometime in the year 2010. He was not aware of them in 2009.

During the time he was representing Triple Tee he did not observe Judge McBryde exhibiting any bias or prejudice against Triple Tee. He does recall that Judge McBryde stated on the record at a hearing that he disagreed with Gillig and did not find him credible on certain issues, but he does not consider that those comments rise to the level of bias or prejudice. Everything Judge McBryde said relative to Gillig's credibility was stated on the record. He explained:

> Q. But aside from whatever is of record in the court, did you hear Judge McBryde say anything that would show bias or prejudice during the time that you represented Triple Tee or Mr. Gillig?
>
> A. No. I mean, everything that I recall has been on the record. I think Judge McBryde has a history in this court of being very careful and judicial in having matters on the record, even to the point of status conferences and short conferences with the counsel, which a lot of judges may not have on the record. I

believe -- I'm not aware of an instance where Judge
McBryde has never had anything not on the record.

Id. at 164.

On cross-examination by Tatum, Suder said that if Cleveland
said he tried to call him several times the weekend before
February 2, he would believe Cleveland.  In conclusion, Suder
testified:

> THE COURT:   . . . .
>
> Has anyone ever asked you if the things that are
> said in Mr. Gillig's affidavit where he attributes
> certain things to me, other than what you were asked in
> this hearing today, has anyone previously asked you if
> I said those things?
>
> . . . .
>
> THE WITNESS:  No.  Prior to your order on show
> cause and things of that, no, no one ever had.
>
> . . . .
>
> THE COURT:  And had anybody even discussed that
> declaration with you before I entered my show cause
> orders in this proceeding?
>
> THE WITNESS:  I don't believe so, Your Honor.

Id. at 167.

Suder said that at the one hearing conducted in the
courtroom in Triple Tee I at which Gillig was in attendance,
Judge McBryde made a finding on the record of something to the

effect that Gillig could not be believed.  That was not something said off the record as the judge entered the courtroom.

E.  Dunn

Dunn is an employee with Suder's law firm, and was so employed throughout Triple Tee I.  During the July 6, 2005, pretrial conference she was seated along the back wall, which would be on the bottom of the Exhibit A diagram, in the right-hand corner as she looks at the exhibit.  She cannot recall who was seated against that wall with her.  When Judge McBryde entered the conference room, she believes everyone stood, and everything got very quiet.  She does not recall Judge McBryde walking in front of her, but cannot honestly say where he walked. She does not recall that the judge said anything after he opened the door and as he moved to the head of the table, at the top of the Exhibit A diagram.  She was trying to listen very carefully because she was to take notes of anything said during the conference.  Her notes did not contain anything indicating that Judge McBryde said what Gillig put in his declaration.  She made good notes.

She has no recollection of hearing the judge make any of the comments Gillig attributed to him in Gillig's declaration.  Judge McBryde was courteous and polite to the people in the conference

room, and treated everyone with respect. Her recollection is
that Suder was seated at the place where Long is shown on the
diagram to have been seated. She did not hear Judge McBryde make
any comment to Suder that he should not expect to get a house out
of the case. She does not recall that she heard anything at the
July 6, 2005, conference that exhibited some kind of bias or
prejudice against Gillig. She thinks she would have sensed that
if it had occurred.

If she had received a call from Cleveland at any point
asking about any of the matters she has been questioned about
during the hearing, she would have referred Cleveland to Suder.
She did not, to her knowledge, receive a call from Cleveland
asking about any of the things that have been discussed during
the hearing.

F.   Taylor

Taylor is an attorney who practices in Fort Worth. As a law
clerk for Judge McBryde from August 2004 to August 2005 he was
assigned to Triple Tee I. He attended the July 6, 2005, pretrial
conference. His recollection is that when the judge entered the
room, he opened the door for the judge, and then followed the
judge up to the place where they sat during the conference. He
believes that he and Judge McBryde went from the door up to their

45

seat on the opposite side of the table from what is shown on the Exhibit A diagram.

Judge McBryde did not tell him before going into the room that he was going to say anything to Gillig. He does not believe the judge would have known which person in the room was Gillig. He does not recall the judge slowing down to make any comment to any person as they entered the room, and he believes that he would have noticed it if the judge had done so. During the entire time he worked for Judge McBryde, he does not ever recall him making a statement to a party unless it was on the record. He would have considered it weird or bizarre if Judge McBryde had gotten up to the front of the table and announced that this case would never make it into his courtroom. Taylor said, "I can absolutely assure you that nothing like that could have possibly occurred without my remembering it," and he does not remember it. Id. at 181.

G.    Renk

He represented Nike and Stites in the defense of Triple Tee I. The Exhibit A diagram attached to Gillig's declaration incorrectly shows where Long and Suder were seated. Suder was seated directly across from him, and Long was seated next to Suder. He believes that Casto was seated next to Long, and that

Dunn was seated on the back wall near Gillig. The diagram correctly shows where he was seated. Van Es was seated next to him, and Martinez was seated next to van Es. Stites was seated immediately behind him, along the wall.

When Judge McBryde entered the room it became very quiet, and it stayed quiet as Judge McBryde walked to the head of the table. He never heard Judge McBryde address Gillig at any time. He does not recall the judge making any comment to Suder about Suder looking for a house out of the lawsuit or words to that effect. He was paying close attention when Judge McBryde came into the room. He had never met Judge McBryde before, and was interested in paying close attention and seeing what the judge would have to say and how he would act. He did not hear Judge McBryde make any of the comments that Gillig has asserted in his declaration that the judge made. Renk affirmatively stated that his testimony is that no such comments were made during the time he was in the room.

As Judge McBryde entered the room and went to the head of the table he traveled behind the Nike lawyers, between them and Stites, on the opposite side of the table shown as Judge McBryde's path on the Exhibit A diagram.

He, Martinez, and van Es filed declarations in response to Gillig's declaration. He is not aware of Gillig or his attorneys making any changes in the Gillig declaration after the filing of their responsive declarations saying that Gillig's declaration was erroneous and false. No one, other than Kirkley, has contacted him to determine whether what Gillig said in his declaration was false. Kirkley had a conference call with him and van Es on the line. Kirkley asked van Es the same things Renk was asked at the hearing, and van Es gave basically the same answers Renk gave at the hearing. He does not recall anybody contacting him or van Es before or after Gillig's declaration was filed to verify the accuracy or inaccuracy of the declaration.

He is aware of the declaration that Long filed as a part of a motion to recuse, which had attached to it the same Exhibit A diagram that was attached to the Gillig declaration. After he, van Es, and Martinez filed their declarations disputing the statements made in the Gillig declaration, no one, including Long, made any contact with him or van Es before filing the Long declaration to find out why they said what they said in their declarations. Court Exhibit 5 is a document the Nike attorneys filed in reply to the document Triple Tee and Gillig filed in opposition to Nike's motion to reassign the case to Judge

McBryde. His declaration and the declarations of Martinez and van Es are included in that exhibit, which was filed in Triple Tee II in February 2009.

He was representing Nike in Triple Tee II while it was pending in Florida, before it was transferred to this court. He is the one who filed Nike's memorandum in Triple Tee II asking that the case be transferred from Florida to Fort Worth. That memorandum has been marked Court Exhibit 3. Gillig and Triple Tee did not take the position in opposition to Nike's motion to transfer the case from Florida to Fort Worth to be assigned to Judge McBryde that Judge McBryde had any bias or prejudice against Gillig or Triple Tee.

H.  Stites

Stites was a defendant in Triple Tee I, and was in attendance at the July 6, 2005, pretrial hearing. He had not met Judge McBryde before that hearing, and had not been in that conference room before. The conference room was very quiet when the judge walked in. Stites was very involved in the case, and had all his receptors up. When the judge walked into the room, he walked up the left side of the room, between him and his attorneys. Judge McBryde did not say anything to Gillig as he entered the room. He does not recall the judge saying anything

to Suder.  When Judge McBryde reached the head of the table, he did not say anything to the effect that the case would never make it to his courtroom.  He believes he would have heard that if it had been said because he was completely focused.

I.  Casto

Casto practices law in Fort Worth.  He was in attendance at the July 6, 2005, pretrial conference as an attorney for Triple Tee.  At that time he was practicing law with Suder.  During the pretrial conference he would have been seated on the side of the table with Suder and Long, referring to the Exhibit A diagram to Gillig's declaration.  Dunn was seated on the back wall along with Gillig, he believes.

Everyone in the room quit talking when Judge McBryde entered, though there was some bustle in the room because everybody stood up and then everybody sat down.  He vaguely recalls that at some point after the judge entered the room, the judge made a comment about how many lawyers were there, about the expense of it, and something about hoping that it was on a contingency.[9]  He cannot think of anything else Judge McBryde said.

_____

[9]The witness remembered comments Judge McBryde made on the record immediately after the pretrial conference started.  See supra at 15.

J.  <u>Silverman</u>

Silverman is a patent attorney who lives in Newark, New Jersey.

Long filed Triple Tee I in Florida for Triple Tee.  At that time Long was a member of the firm of Silverman Santucci. Silverman was admitted pro hac vice to represent Triple Tee in Triple Tee I after it was transferred to Fort Worth.  Silverman was well-informed with everything that went on in Triple Tee I from the time it was filed in Florida all the way through the end.

When Gillig said in his declaration that certain things happened on July 15, 2004, Gillig intended to refer to the July 6, 2005, hearing.  Silverman maintains that the July 15, 2004, date in the Gillig declaration was a typographical error.  He is not sure whether Tadros or Cleveland typed the version of the declaration actually signed by Gillig.  Tadros was very much involved after the transfer of Triple Tee II from Florida to Texas.  He had a transcript of the July 6, 2005, hearing in his Florida office.  Tadros is of counsel with his Florida firm, had access to the transcript, and was supposed to have reviewed it. He discovered the error in the Gillig declaration when he received Renk's declaration submitted with Nike's reply.

The preparation of the Gillig declaration was a multi-lawyer process, with Tadros, Cleveland, and himself all being involved in drafting the declaration.  Gillig also was involved by providing two or three weeks before the January 22, 2009,[10] signature date the raw input for the document, which served as the starting point.  A draftsman employed by him prepared the Exhibit A plat to Gillig's declaration, working from a rough sketch Gillig prepared and in consultation with Gillig.

Before the Gillig declaration was filed, he asked Gillig to call Suder to see if he might be able to provide a corroborating declaration.  They were looking for corroboration from whatever source they could find before Gillig's declaration was finalized "[b]ecause of the gravity . . . of the document which [they] were to file."  Id. at 234.  Gillig told him that he had called Suder.  Silverman said they tried to get in touch with Casto about two weeks before Gillig signed his declaration, but were unable to.  Other than Gillig, Tadros, and Cleveland, he did not talk to anyone to see if what Gillig put in his declaration was true.  He discussed it with Cleveland because he thought Cleveland had a

_____

[10]From time to time during the October 27-28, 2010, hearing, the court, the questioning attorneys, and the witnesses used incorrect dates when referring to the January 22, 2009, declaration, primarily because the handwritten "2009" in the date at the end of the declaration could be taken to be "2008."

channel to Suder--that they were on speaking terms. Cleveland told him one or two weeks before the declaration was filed that he had discussed with Suder the accuracy of Gillig's declaration, but Cleveland did not tell him what Suder said. He did not get any indication from Cleveland that Suder corroborated Gillig's declaration before it was filed. Gillig had already told him that Suder said that what was stated in the declaration was pretty much what he remembered. He does not know if Gillig actually found out from Suder what he meant by "pretty much."

He agrees that the July 6, 2005, transcript does not contain anything indicating that Judge McBryde threatened to hold Gillig and his attorneys in contempt of court if they did not file a document the next day. He read that transcript before Gillig signed his declaration. When asked why he approved of the filing of the Gillig declaration with that incorrect statement in it, the following exchange occurred:

THE WITNESS: Well, we had local counsel.

THE COURT: Pardon?

THE WITNESS: We had local -- this was 2009. This was the beginning of 2009. That's the date here. I was in the first instance reliant on our lead counsel, Ms. Tadros.

THE COURT: On who?

THE WITNESS: Our lead counsel, Jacqueline Tadros, in the first instance; second instance, on our local counsel. So my read oftentimes was the third read down the line, and I can only apologize to the Court.

THE COURT: Are you saying that if two other people are willing to file a false declaration that makes it okay for you to participate in it?

THE WITNESS: Of course not.

THE COURT: What are you saying?

THE WITNESS: I'm saying that if I missed that, which I obviously did, I can only apologize to the Court, because I had later reread those in light of the show cause order and could not find those references.

Id. at 243.

Near the conclusion of the portion of his testimony pertaining to the Gillig declaration, the following exchange occurred:

Q. . . . .

After hearing the questions you have been asked today, and you've heard from the various witnesses that have testified, do you still think that to the best of your knowledge that the statements are accurate that are in the Gillig declaration?

A. Well, frankly, I'm really shocked and appalled at much of what I have heard today and I no longer know what to think. I'm just very disappointed that a client could possibly lie to his lawyer, if that's what happened.

Id. at 260.

In answering what he did to determine whether Long's declaration was true before he filed it, Silverman said:

> THE WITNESS: Other than to reread those two transcripts of '05 and '07, I -- as I said, I searched my memory because Mr. Long had been a partner with me. He had from time to time made reference to this issue, so it was mainly a matter of trying to recall our historic conversations on the issue.

Id. at 248. He explained why he did not try to contact anyone who was in the room during the July 6, 2005, pretrial conference before Long's declaration was filed by saying, "[w]e considered it, but we simply didn't have the resources to undertake that type of investigation." Id. at 250.

When he and Tadros were taking steps in December 2008 to try to persuade the Florida court not to transfer Triple Tee II to Fort Worth to be assigned to Judge McBryde, they did not make the assertion that Judge McBryde would be biased or prejudiced against Gillig or Triple Tee because they thought it might be irresponsible, and they had their doubts as to whether such an assertion would be true:

> THE COURT: Was it important from the standpoint of Mr. Gillig, Triple Tee, you and Ms. Tadros that the Court in Florida not transfer the case to Fort Worth so it could be assigned to me?

> THE WITNESS: Yes.

THE COURT: Was it important enough to make known to the Court in Florida that if it was assigned to me that it would be assigned to a judge who was biased and prejudiced against the plaintiffs?

THE WITNESS: If Ms. Tadros and I had felt that way, it would have been --

THE COURT: Pardon?

THE WITNESS: If we had felt that way, it would have been important, but at that point, we had not fully bought into --

THE COURT: You didn't think that?

THE WITNESS: We hadn't formed that conclusion yet, no.

THE COURT: Okay. It is a fact that the declaration of Mr. Gillig you prepared for filing in the court in Florida to oppose the transfer of the case in Fort Worth to be assigned to me said nothing about anything that happened at the July 6, 2005 pretrial conference; is that correct?

THE WITNESS: As I said, I did not prepare that, but I read it and it did not say anything about that.

THE COURT: And there's not one word in the memorandum in opposition to the motion of Nike to transfer the case from Florida to Fort Worth to be assigned to me, or any of the attachments to that motion, to suggest that I was in any way biased or prejudiced against any of the plaintiffs?

THE WITNESS: That's correct.

THE COURT: Okay. Why was that not put in there? Is it because you just didn't think that would be true?

56

> THE WITNESS:  As I said, Ms. Tadros and I were not totally sold on -- on that allegation, that assertion, and we thought it might be irresponsible.

> THE COURT:  You thought it wasn't true?

> THE WITNESS:  We had our doubts.

Id. at 269-70.

A similar misgiving about the honesty of Gillig's version of events was the reason why a declaration from Gillig was not provided to the court along with Long's declaration in the June 17, 2010, motion to recuse.  Silverman's explanation on this subject was as follows:

> Q.  Why didn't you attach the Gillig affidavit, declaration, to the motion to recuse along with the Tracy Long affidavit or declaration?

> A.  That's a very good question and, frankly, the answer is I was just beginning to be less than comfortable with Mr. Gillig's testimony, and I concluded I was not going to use his declaration again for any purpose.  So I went with someone, like I said, I had known for many years, and who had successfully run our litigation department and had a spotless record to my knowledge.

> .  .  .  .

> THE COURT:  -- and you had lost confidence in what Mr. Gillig said?

> THE WITNESS:  Yes.

> .  .  .  .

*Q.* And you made a conscious decision not to use Mr. Gillig's because you didn't have any confidence in what he had anymore, right?

*A.* Like I said, I began to have my doubts.

Id., Vol. 2 at 104-06.

Silverman said Cleveland was still an attorney for the plaintiffs in Triple Tee II when the motion to recuse was filed in June 2010. Cleveland did not sign the motion to recuse. He asked Silverman to sign it, explaining that he had some general reservations. He assumes that Cleveland's secretary removed Cleveland's name from the motion before it was filed, but he did not know the name had been removed before the filing.[11] There was no discussion between him and Cleveland about Long's declaration before the motion to recuse was filed.

Tadros, who is a subtenant of his, prepared the Long declaration. He discussed with Long the accuracy of his declaration before it was filed; and, he and Tadros made a number of changes. Tadros's starting point in preparing the Long declaration was the January 2009 Gillig declaration. The failure of Tadros to tell Long about the declarations the Nike attorneys filed in February 2009 was an oversight by Tadros.

_____

[11]At this point in the questioning of Silverman, the court asked Cleveland whether his office filed the motion to recuse, and Cleveland said that he did not know.

*    *    *    *    *

Based on Silverman's demeanor on the stand and the nature of

his testimony, the court finds that Silverman is not credible,

and that much of what he said is not worthy of belief.

K.   Long

Long is a lawyer of twenty years who practices in South

Florida.  He said he has been present throughout the testimony,

and that he is "quite agitated by it."  Id., Vol. 1 at 273.  Long

would not have given his declaration if he had been told that the

Nike attorneys had given declarations disputing Gillig's

declaration.

His testimony indicates that he gave his declaration because

he felt he had an obligation to Gillig, as a former client, to do

so.  On this subject, he explained:

> THE COURT:  Did Mr. Silverman or anybody tell you
> what they were going to do with your declaration?
>
> THE WITNESS:  When I was originally contacted, it
> was by Mr. Gillig, who asked me about the July 6th
> hearing and my recollection of it.  They wanted me to
> do a declaration, but I wasn't aware, at the first
> conversation, what they were going to do with it.
>
> Mr. Gillig indicated that he had tried to contact
> Mr. Suder and Mr. Suder would not help him, and he
> tried to contact Mr. Casto and Mr. Casto would not help
> him.  So I thought I was being put in a position as

counsel to a former client, what were my
responsibilities at that point.

Id. at 274-75.

Based on what he heard during the hearing, he recognizes

that he gave a false declaration, and he apologizes for having

done so.

Long, who was present during the July 6, 2005, pretrial

conference as an attorney for Triple Tee, gave equivocal answers

as to whether he remembered any of the things he declared in his

declaration were said by Judge McBryde as he entered the room on

July 6, 2005; however, the overall impression one gains from

Long's testimony is that he simply was accommodating Gillig by

making the declaration, and was relying on Gillig to tell him

what to put in it.  As had Gillig and Silverman, he relied on

things Judge McBryde said on the record on July 6, 2005, and

during the July 10, 2007, telephone conference to justify some of

the statements he put in his declaration.

He did not attach any bias to whatever Judge McBryde said at

the July 6, 2005, pretrial conference--that never crossed his

mind.  The original draft of the declaration he was asked to sign

said that Judge McBryde was biased or prejudiced against Gillig,

and he refused to sign that because he did not believe that was

true.  He never believed throughout Triple Tee I that Judge McBryde acted with any bias or prejudice toward Gillig, although Gillig, throughout Triple Tee I, insisted that Judge McBryde was biased or prejudiced against him, and wanted to take that position, against Long's advice.

Silverman is the one who e-mailed the proposed declaration to Long.  After he received it, he talked to Gillig, and told Gillig that he would not put in the declaration that he thought Judge McBryde was biased or prejudiced toward Gillig.  Long dragged his feet about signing the declaration, and he would not take Gillig's telephone calls at first, but finally did.  His specific concern was "what are my duties to a former client." Id. at 280.  He consulted the Florida Bar Rules to see whether there was anything that required him to give the declaration, and could not find anything conclusive.  "[W]hat went through [his] mind was [he] had counseled Mr. Gillig not to do a motion to recuse the entire time during TTG," but "[Gillig] was very passionate about what he believed was bias or prejudice."  Id. By way of further explanation of why he went ahead and signed the declaration, he said:

> I did not believe ethically or morally it was my
> duty to stand in his way if he really wanted to argue
> that in front of the Judge.  So the most I was willing

to do is verify my recollection based upon, you know, refreshing my recollection, but I would not, again, not say that there was any bias. He was on his own if he wanted to make that argument to the Court.

And I would say that at the time, I believed that Texas counsel was involved in the case and would, you know, counsel him one way or the other on whether to proceed with that.

Id. at 280-81.

To whatever extent the declaration he signed was based on his recollection, after hearing the testimony of the other witnesses, he has cause to doubt his recollection. He did not call anyone else who was in the conference room during the July 6, 2005, pretrial conference to verify accuracy of things said in his declaration because he thought it would be improper for a witness to ask another witness about their recollection and to base a declaration on that, so he attempted to "distance [himself] from anybody else before [he] rendered that declaration." Id. at 285. He now sincerely regrets relying on Gillig as a witness in putting what he put in his declaration. Id. at 285-86.

At the conclusion of his testimony, Long said that he would like to withdraw his declaration:

THE COURT: Mr. Long, what did you do when you discovered that you had been tricked into signing that

declaration by them not telling you about the declarations the Nike lawyers had filed?

THE WITNESS: Well, I found out about that today as I'm sitting in this courtroom. Last night, I was reading Mr. Cleveland's declaration, which I had been provided. And I don't know if Your Honor could tell, I sat back there having heart palpitations because I was so angry.

I mean, I would formally like to withdraw that declaration in total today, if I can.

THE COURT: Who do you think tricked you into signing your declaration?

THE WITNESS: Mr. Silverman and Mr. Gillig, by not giving me the entire history and the entire, you know, declarations that were done by Nike. I think that was a key bit, piece of evidence.

Id. at 291-92.

L.    Cleveland

Cleveland has been a practicing attorney in Fort Worth for twenty years. He has been a commercial litigator for eighteen years, with the last ten years devoted ninety percent to the handling of federal litigation, either in the Northern District of Texas or other districts throughout the country. He is familiar with the local rules of the Northern District and Rule 11 of the Federal Rules of Civil Procedure. Cleveland has been in the courtroom since the hearing started and heard the testimony.

His billing records indicate that he was contacted by an attorney based in Dallas on January 22, 2009,[12] about the possibility of representing the plaintiffs in Triple Tee II. He entered into a written agreement dated January 23, 2009, which was signed by Gillig and Triple Tee on January 28, 2009, "for the limited purpose of making an appearance in the Lawsuit and responding to the pending motion to transfer venue." Hr'g Cleveland Ex. 9 at 1. At that time, Nike's motion to reassign the case from Judge Means to Judge McBryde was pending. Judge Means previously had extended the deadline for the filing of a response to the motion to February 2, 2009.

He did not prepare the Gillig declaration or the diagram marked Exhibit A to the declaration, but he did prepare the response in opposition to Nike's motion to reassign the case. Silverman had sent him a draft of a response, but he did not use any part of it, and rewrote the whole thing. He placed his electronic signature on the response and filed it electronically.

_____

[12]The fact that the date of the signing of Gillig's declaration coincides with the date when Cleveland said his billing records indicate he was contacted about Triple Tee II could well be a coincidence. However, the testimony of Gillig and Silverman suggests that Cleveland might have been involved in the preparation of the declaration. See supra at 30-31, 35, 52-53. For the purpose of this memorandum opinion and order, the court is assuming Cleveland was first contacted about Triple Tee II the same date the declaration was signed.

He takes full responsibility for the document.  He did not retain the draft that Silverman sent him.[13]

During the hearing, Cleveland produced documents that included documents pertaining to Triple Tee II while it was pending in the Southern District of Florida, which he says were pulled by his secretary on January 30, 2009.  Those documents included Nike's December 20, 2008, motion to transfer the action from Florida to the Northern District of Texas to be assigned to Judge McBryde, Nike's memorandum in support of that motion, and the order signed by the Florida court December 12, 2008, granting Nike's motion.  Absent from the documents produced by Cleveland was the memorandum Triple Tee and Gillig filed with the Florida court in opposition to Nike's motion to transfer Triple Tee II to Texas for assignment to Judge McBryde and the December 2008 Gillig declaration that was presented to the Florida court in support of the opposition to the transfer.[14]  When asked about

---

[13]At an earlier point in the hearing, when asked about the "95 or 100 pages of documents," Silverman said he had delivered to Cleveland at the outset of Cleveland's involvement, Cleveland said that he and his staff had made a search for those documents and "either they were misfiled or they were reused during the course of [Triple Tee II]," with the result that he is "unable to locate those documents." Hr'g Tr., Vol. 1 at 296.

[14]The documents to which the court referred in the sentences immediately preceding the footnote reference were produced shortly before Cleveland commenced his testimony, and were filed with the papers in this miscellaneous action on October 29, 2010, with a cover sheet titled "Joe Cleveland Documentary Evidence Produced Pursuant to Court Order, Volume III (Court Documents Obtained from
(continued...)

the absence of those documents, Cleveland was unable to provide an explanation. He said he does not recall whether it occurred to him that it might have been important to see what position Gillig and Triple Tee were taking when the case was pending in Florida as to why it should not be transferred and assigned to Judge McBryde. He does not recall whether he ever saw what position the plaintiffs took in response to Nike's motion to transfer from Florida to Judge McBryde.[15]

Cleveland was asked about an e-mail message from Silverman to him the morning of January 31, 2009, that said "[f]urther to our recent conversation, we will delete any direct reference to McBryde's 'fabrication' finding at the top of p 6 of the brief." Id. at 27; Vol. I of Docs. filed by Cleveland Oct. 29, 2010, at APP-344.[16] He agreed that the "fabrication" reference had to do with a finding Judge McBryde had made during Triple Tee I "that

---

[14](...continued)
PACER System)."

[15]Cleveland's inability to recall, or lack of recollection, concerning the very important, indeed most important, Florida court documents was typical of many instances when Cleveland had a lack of recall on significant matters that he should have remembered, thus raising credibility concerns about Cleveland's testimony.

[16]Shortly before Cleveland's testimony commenced, he produced a group of e-mails, letters, and similar items that he represented were the items available in his office pertaining to work lawyers and his firm did in connection with Triple Tee II from January 22, 2009, through February 16, 2009. Those items were put in a bound volume and filed October 29, 2010, with a cover sheet titled "Joe Cleveland Documentary Evidence Produced Pursuant to Court Order, Volume I (pp. App. 343-439)."

Mr. Gillig was fabricating" or "was a fabricator."  Hr'g Tr.,
Vol. 2 at 30-31.  He added that he really does not remember
anything about the "fabrication" reference.

The documents he used in preparing the response in
opposition to Nike's motion to reassign the case from Judge Means
to Judge McBryde were two opinions of the Fifth Circuit Court of
Appeals and, he believes, maybe two opinions that Judge McBryde
wrote and a notebook of the 100 or so pages of information
Silverman sent him that he has been unable to find.  He knows for
certain that an executed copy of the Gillig declaration and the
Fifth Circuit's opinion in Triple Tee I were in that notebook.
He has described everything he had to go on when preparing the
response in opposition.

He gave thought to seeking an extension of more time for the
filing of the response in opposition, but decided not to do so
because the previous order Judge Means signed granting an
extension indicated that another one would not be granted.  He
would like to have had more time, say at least two weeks, three
weeks, explaining that he most certainly viewed the accusations
that were being made against Judge McBryde to be very serious
allegations.  He would like to have had more time to contact
Suder, Renk, and Long, and to review all relevant transcripts.

He would like to have verified from talking to those people whether the statements attributed to Judge McBryde actually occurred.

When asked why he inserted in the response in opposition he prepared the two references to the Gillig declaration, and why he did not include in the document he prepared a recitation of the facts Gillig stated in his declaration, he explained:

> THE COURT: And what was your purpose in adding those [references]? What was the reason for adding those?

> THE WITNESS: Well, I had never personally met Mr. Gillig in person, ever, and I had never personally met Mr. Silverman, and I felt that -- that I did not have adequate time to verify each and every assertion that Mr. Gillig was making in his declaration.

> On the other hand, I was faced with a client, a new client, that was adamant about filing something that I didn't know -- I mean, I had -- I had information which I felt supported some of the statements that he made, and assurances from Mr. Silverman, but I -- I felt like that I needed to make it clear to the Court that I was not vouching for this testimony.

> THE COURT: Is that why you did not recite in the response as facts any of the facts that Mr. Gillig stated in his affidavit -- in his declaration?

> THE WITNESS: That's correct, Your Honor.

> THE COURT: You weren't willing to say in the response that those, in fact, were true?

> *THE WITNESS:* That's correct, Your Honor.

<u>Id.</u>, Vol. 2 at 37-38.

Having appeared as many times as he has before Judge McBryde, he thought it was unlikely that the judge had said as he entered the conference room what Gillig attributed to him.

He said he unsuccessfully attempted to call Suder on January 30, but he did not talk to Suder until after Nike filed its reply, which was accompanied by the declarations of Renk, van Es, and Martinez establishing the falsity of Gillig's declaration. His recollection is that he reached Suder on February 10, 2009, eight days after he had filed the response in opposition. He may have been in his car when he talked to Suder--he did not have the Gillig declaration in front of him when they talked. His conversation with Suder was very short; and, Suder recalled the judge making a comment about a ski lodge in Colorado and to a house in Florida, and Suder said that Judge McBryde had been very hard on Gillig at some proceeding. The testimony leaves the impression that he never pointedly asked Suder whether the things Gillig said in his declaration were true.

He did not try to call Casto because he doesn't think Casto was in the firm in 2009, and he does not know Casto. He did not have any pages from the July 6, 2005, pretrial hearing transcript

before he filed the response--he simply relied on what Silverman told him and what he learned from talking to Gillig.

When asked if he pulled up the docket sheet on Triple Tee I to see who all was at the July 15, 2004, conference Gillig mentioned in his declaration, he said that he did not, and that such failure "was a mistake on [his] part." Id. at 45.  He did not make any effort to find out what the records on file in Triple Tee I at the courthouse showed.  He did tell Silverman "that if you're going to make an accusation like this, this needs to be absolutely accurate." Id. at 47.  He did not ask Silverman to let him see the transcript, explaining:

> THE WITNESS:  No. I relied on Mr. Silverman and Mr. Gillig to prepare a declaration to the level of accuracy that I would have, and the rigor with which I would have prepared a declaration, and that was a mistake.

Id.

Other than Gillig, he did not, prior to filing the response in opposition, talk to anybody who attended the July 6, 2005, pretrial conference.  He has a vague impression that Silverman represented to him that he was getting other declarations to confirm what Gillig had said in his, which Silverman was to provide for filing with the response in opposition; however, he

never got a declaration of anyone confirming what Gillig put in his.

He has never read the Long declaration that was filed with the motion to recuse Judge McBryde. He was on his way out of the case at that time. The first time he ever saw Long was at the hearing; and, he does not think he and Long even spoke while the hearing was in progress. After he received the declarations of Renk, van Es, and Martinez, he had grave reservations as to whether Gillig's declaration was false. He did not know what was going on, and was gravely concerned.

He knew before he filed the Gillig declaration as part of the response in opposition that Gillig had been judicially determined to be a fabricator. With respect to the level of confidence he had in Gillig's declaration, he responded as follows:

> THE COURT: Did that cause you some concern to rely on Mr. Gillig to do something as serious as you did by filing his declaration and asking Judge Means to consider it?
>
> THE WITNESS: That gave me some pause as well.

Id. at 52.

After the declarations of the Nike lawyers were received, Silverman, Gillig, and perhaps Tadros undertook to prepare a

71

corrected declaration. The corrected declaration was presented to him on February 11, which was the day Judge Means granted Nike's motion and transferred the case to Judge McBryde. He thought the matter had been concluded. In retrospect, he thinks that a corrected declaration should have been filed, and he apologizes for having failed to file one. When asked what the correction would have been, he non-responsively said:

> THE WITNESS: I think I would need to -- I would have needed the two weeks to get Jon Suder. I would -- and talk to Mr. Gillig, and get the transcripts to get it sorted out to where it was absolutely accurate, which is my normal practice.
>
> And the normal practice that I have been encountering in my entire professional career is dealing with lawyers and clients that want to provide accurate and correct information.

Id. at 54. Knowing what he now knows, the Gillig declaration never would have been filed.

After he received the show-cause order, he read the transcript of the telephone conference when Judge McBryde was making remarks to the end of encouraging the parties to discuss settlement. He did not find anything in the transcript to be something that would indicate bias or prejudice, or that was uncommon in the experience he has in courts that judges will try to encourage parties to settle cases and will make comments to

make the parties be realistic in their approach. After the show-cause order, he read every transcript in Triple Tee I, including the July 6, 2005, transcript. He did not find anything in that transcript that would indicate a bias or prejudice on the part of Judge McBryde against any of the parties or attorneys in the litigation. What he read would be typical of what he has experienced in federal courts throughout his practice. There was not anything in the transcript that appeared to be directed at a party. He found when he read the July 6, 2005, transcript that the judge was focused on trying to get the pretrial order in shape, and trying to encourage the parties to settle because of the cost and expense that was being incurred in the case for both parties.

The first material he received from Silverman after he entered his appearance as local counsel was an appendix he received by overnight mail on January 29, 2009. Because of other matters he was involved in, he did not begin reviewing the appendix until that evening, which is when he first saw the Gillig declaration. The following day he had two telephone conferences with Silverman and began a review of the materials Silverman had sent him, devoting approximately 5.5 hours to that on January 30. At that time he spent a great deal of time

reviewing the opinions, both of Judge McBryde and the Fifth Circuit, in Triple Tee I and started drafting the response in opposition. He remembers that he reviewed Gillig's declaration the evening of January 29, but he is not sure he looked at it again the next day. On January 30 he discussed the declaration with Silverman, telling him that "this needs to be absolutely accurate, and that this is a very serious allegation that Mr. Gillig is making, and that this declaration needs to be completely accurate." Id. at 60.

He does not remember if he asked Silverman to give him any transcripts. The material he received from Silverman on January 29 contained the text of a proposed response. The evening of the next day he decided that the proposed response needed some reworking, and he and Silverman decided that Cleveland would rework the draft. He did that on Friday and Saturday. He was satisfied that it needed to be filed the following Monday.

It was clear to him that his client and Silverman had made the decision to file a response in opposition to Nike's motion to reassign the case, and he strongly believed that Judge Means would not grant any further extensions and that the document would have to be filed on Monday. He does not think Judge Means would have allowed him to file it after Monday, and he thinks

that he would potentially have been subject to a grievance had he
not followed the instructions of his client to file what the
client wanted filed, and he thinks that potentially he would have
been subject to a malpractice claim.

On the subject of whether he could have withdrawn from the
case rather than to do something he questioned the propriety of
doing, the following exchange occurred:

> THE COURT: Mr. Cleveland, did it occur to you at
> the time that, rather than to do something that you had
> some question as to the propriety of what you were
> doing, that it would be best for you simply to withdraw
> from the representation of Mr. Gillig and TTG?
>
> THE WITNESS: Are you asking if I gave
> consideration to that before I filed the response? Is
> that your question?
>
> THE COURT: Yes.
>
> THE WITNESS: I think that thought crossed my
> mind, but I knew that if I -- I could not get a motion
> on file, get a conference with opposing counsel, and
> get an order from the Court before that deadline, and
> I would still be potentially on the hook for a
> grievance.
>
> THE COURT: Well, Mr. Silverman could file the
> response, couldn't he?
>
> THE WITNESS: I think -- well, I don't know. I'm
> not sure -- I don't know if he's -- I don't remember.
> His pro hac vice was --
>
> THE COURT: Whether he was or was not at that
> point in time, you have enough experience in the
> practice over here that he could have filed a motion

for pro hac vice appearance and the response at the
same time, which frequently is done.

   *THE WITNESS:* Right.

   *THE COURT:* Why couldn't that have been done?

   *THE WITNESS:* It could have been done had I
decided to withdraw, but I -- I did not.

Id. at 66-67.

   Cleveland discussed how much expense, inconvenience, and
stress he has been through since he received the initial show-
cause order and was required to prepare for this proceeding.  He
estimated that he has devoted between fifty to seventy-five hours
to activities resulting from his receipt of the show-cause order.
The lesson he has learned is that "clients don't always shoot
straight," and "that lawyers representing that client don't
always give you the full information."  Id. at 69.

   Cleveland said that he did not play any role in the
preparation of the supplemental Gillig declaration that was drawn
for filing.  No supplemental declaration was filed, but he
believed that it should have been.  He says that "upon learning
about what I know today, I should have asked that that entire
declaration be withdrawn."  Id. at 84.

   He withdrew from representation of the plaintiffs in Triple
Tee II because of what he considered to be inappropriate conduct

76

on the part of Gillig at a settlement conference conducted in Cleveland's office on June 17, 2010, when Gillig, attorneys for Nike, and a representative from Nike were present. He said, "I observed what I thought was some bizarre behavior by Mr. Gillig." Hr'g Tr., Vol. 2 at 71. The behavior included threats by Gillig to the Nike representatives that he was going to continue to go after Nike until the day he died, or something like that. That was only the second time he had met Gillig in person. The first time was in March 2009.

He was asked about the memorandum dated February 2, 2009, from Silverman to him that included language saying: "That was a good change on p. 1. It communicates the language of the recusal cases without using the term. The entire document looks good to go." Vol. I of Docs. filed by Cleveland Oct. 29, 2010, at APP-398. Silverman had made reference to the sentence on the first page of the response in opposition that tells Judge Means that Gillig believes that Judge McBryde has exhibited personal and extrajudicial bias and prejudice against him, and requests, therefore, that Judge Means exercise his discretion to deny Nike's motion to reassign the case to Judge McBryde. Hr'g Tr., Vol. 2 at 73-74. He does not recall what the point was in conveying that message to Judge Means without actually using the

word "recusal," nor does he recall what the point was in making reference in the response in opposition to the declaration of Gillig in support of that sentence.  Id.

On the subject of whether Cleveland considered the fact that Judge McBryde would not have known who Gillig was when Judge McBryde entered the conference room in order to make a remark to Gillig,

> THE COURT:  . . .
>
> Mr. Cleveland, did it cause you any puzzlement -- before you filed the opposition or response to Nike's motion to transfer on February 2, 2010, did it cause you any puzzlement at that time, or any time before that, how I could have known who Mr. Gillig was when I entered the conference room in order to make a remark to him?
>
> THE WITNESS:  I don't know. I mean, I wasn't -- I don't know. I don't know. I didn't know how this whole thing got set up. I have no personal knowledge of, you know, whether or not there was -- y'all were brought in the room together, I have no idea.
>
> THE COURT:  Well, did you ask Mr. Silverman if I had ever met Mr. Gillig before that incident, before that occasion?
>
> THE WITNESS:  I don't recall.

Id. at 76.

He had only one telephone conference with Gillig before the response was filed, and that was on January 22, 2009,[17] during which Gillig relayed to him most, if not all, of the comments that are in his declaration in the same type of fashion "he relayed here in the courtroom." <u>Id.</u> at 77. "It was very animated, very forceful, very detailed, and that's the only conversation [he] had with Mr. Gillig before the response was filed." <u>Id.</u>

He told Silverman right after the settlement conference in June 2010, when he decided to withdraw, that he did not want his name on the motion to recuse that had been prepared with his name on it, and he instructed his secretary to retype the last page of the motion to take his name off. Silverman had brought the motion, which had the Long declaration attached to it, to the settlement conference. Cleveland did not think a motion to recuse would have valid legal support inasmuch as everything Gillig asserted in support of the motion occurred within the court environs; and, for recusal to be appropriate, "the bias or prejudice had to be extrajudicial, outside the court environs."

---

[17]The court can, and does, infer that Cleveland discussed Gillig's declaration with Gillig during the January 22, 2009, telephone conversation, bearing in mind that Gillig signed the declaration on that date. Thus, Cleveland knew before he undertook employment, and at least eleven days before the February 2, 2009, deadline for filing the response in opposition, the contents of the declaration he ultimately used as an attachment to the response in opposition he filed on the deadline.

<u>Id.</u> at 91. Cleveland, in so many words, acknowledged that even if the facts stated in the Gillig declaration had been true, there would not be a legal reason for Judge McBryde to recuse.

V.

<u>Analysis</u>

A. <u>The Gillig and Long Declarations Contained False Factual Contentions That Did Not Have Evidentiary Support, and the Declarations Were Presented for an Improper Purpose</u>

The evidence proves, and the court finds, that the Gillig and Long declarations at issue in these proceedings contained false factual contentions. As to Gillig's declaration, the evidence proves, and the court finds, that (1) there was no conference in Triple Tee I at the courthouse during July 2004 as stated in paragraph 4 of the declaration, and that the undersigned (2) did not exhibit personal and extra-judicial bias and prejudice against Gillig, as contended in paragraph 3; (3) did not say or do the things described in paragraph 5; (4) did not at the pretrial conference in Triple Tee I held July 6, 2005, threaten to hold Gillig's lawyers and Gillig in contempt, as stated in paragraph 7; (5) did not say, in so many words, at a July 5, 2007, pretrial conference in Triple Tee I that he was less than happy with the opinion of the Fifth Circuit and was

80

still looking for a way to dispose of this case, apart from trying it, as stated in paragraph 8; and, (6) did not briefly leave the courtroom and, upon returning, but before reaching the bench, tell Gillig he did not believe anything that Gillig had said. In other words, virtually every factual contention made in the Gillig declaration was false.

As to the Long declaration, the evidence proves, and the court finds, that factual contentions made in its paragraphs 8, 9, and 10 are false, and lack evidentiary support. The evidence establishes, and the court finds, that the undersigned did not say at the July 6, 2005, pretrial conference in Triple Tee I any of the things attributed to him in paragraphs 8 and 9, and that he did not take the path from the entrance to the conference room to the place where he was seated that is shown on the Exhibit A to the declaration.

The evidence proves, and the court finds, that each of the declarations was filed for the improper purpose of creating the appearance in the record of Triple Tee II that the undersigned was disqualified from presiding over that action.

B.    The Rule 11 Violations

    1.    As to Silverman and Long

    The evidence, although circumstantial, establishes, and the court finds, that Silverman did not believe that any of the false factual contentions in the Gillig declaration were true or had evidentiary support.  Rather, the evidence circumstantially establishes, and the court finds, that he knew that such factual contentions did not have evidentiary support, and were false, when he presented the Gillig declaration to the court in February 2009 in support of the response in opposition to Nike's motion to reassign Triple Tee II from Judge Means to the undersigned.

    There is no doubt in the court's mind, and the court finds, that, if Silverman thought the facts asserted by Gillig in his January 22, 2009, declaration were true, he would have used those facts in his December 2008 efforts to persuade the court in Florida not to transfer the case to this court for assignment to the undersigned.  By then, Gillig and Silverman apparently were desperate to cause a judge other than the undersigned to preside over Triple Tee II.[18]  They knew the undersigned had made judicial determinations in Triple Tee I that Gillig was a

---

[18]Gillig testified that "[w]e did everything we could with the Florida courts not to have it come back here to Texas." Hr'g Tr., Vol. 1 at 103.

fabricator, a person not worthy of belief. Credulity would be stretched too far to accept the contentions of Gillig and Silverman that when Triple Tee II was pending in Florida Gillig and Silverman knew of facts that they believed would disqualify the undersigned from presiding over that case but chose not to call any of those facts to the attention of the Florida court in their opposition to Nike's request that the case be transferred to the undersigned. The court finds that there were no such facts, and Silverman knew there were none.

The testimony at the hearing leads to the inference, which the court finds to be fact, that the description Gillig gave of conduct of and statements made by the undersigned at a status conference on July 15, 2004, in Triple Tee I was the product of Silverman and Gillig searching through the transcripts of proceedings in Triple Tee I for on-the-record comments by the undersigned that could be, and were, used in creating what they knew to be a fictitious scenario used in the declaration of off-the-record comments by the undersigned at the nonexistent July 15, 2004, conference. Gillig and Silverman, and perhaps one or more of the other attorneys[19] for Triple Tee, were engaged in a

---

[19]Gillig's testimony suggests that Tadros and Cleveland participated in preparing the fictitious
(continued...)

desperate effort to keep Triple Tee II from being transferred from Judge Means to the undersigned when they conceived the notion of the fictitious Gillig declaration and then prepared it for filing.

While the evidence establishing Silverman's knowledge of falsity of Gillig's declaration is circumstantial, it clearly establishes his knowledge that the declaration he and Cleveland presented to the court on February 2, 2009, contained false statements of fact. Silverman had no reason to believe, and did not believe, that those statements were true.

The evidence also clearly establishes, and the court finds, that neither Silverman nor Long believed that any of the false factual contentions in the Long declaration were true or had evidentiary support when it was filed. The evidence establishes, and the court finds, that each of them knew that such factual contentions did not have evidentiary support, and were false, when the Long declaration was presented to the court in June 2010 in support of the motion to recuse the undersigned in Triple Tee II.

---

[19](...continued)
declaration. The court does not need to make a finding as to whether Tadros participated, and the court is not prepared, considering Gillig's lack of credibility, to accept as fact that Cleveland participated in creating the fictitious declaration, though the court recognizes the possibility that he did.

Moreover, the evidence proves, and the court finds, that Silverman knew that the Gillig declaration was presented to the court for the improper purpose of creating the false appearance that the undersigned was not qualified to preside over Triple Tee II. Long and Silverman both knew that was the purpose in presenting the Long declaration to the court.

Therefore, the court finds, and concludes, that Silverman and Long each has violated the provisions of Rules 11(b)(1) and (3).[20] The deemed Rule 11(b) certification by Silverman when he joined with Cleveland in presenting the Gillig declaration to the court for consideration "that to the best of [his] knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . [the Gillig declaration was] not being presented for any improper purpose" and "the factual contentions [in that declaration] have evidentiary support" was a false

_____

[20]Rules 11(b)(1) and (3) provide in pertinent part as follows:

(b)    REPRESENTATIONS TO THE COURT. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1)    it is not being presented for any improper purpose . . . ;

. . . . [and]

(3)    the factual contentions have evidentiary support . . . .

certification in violation of Rules 11(b)(1) and (3). The deemed Rule 11(b) certifications by Silverman and Long when they presented Long's declaration to the court for consideration "that to the best of [their] knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . [Long's declaration was] not being presented for any improper purpose" and "the factual contentions have evidentiary support" were false certifications in violation of Rules 11(b)(1) and (3).

   2.   As to Cleveland

   The evidence proves, and the court finds, that Cleveland did not have a reasonable basis for a belief that the false factual contentions contained in the Gillig declaration were true, or had evidentiary support, when he, along with Silverman, presented the declaration to the court with the invitation to the court to take it into account in determining whether Nike's motion to reassign the case to the undersigned should be denied. Cleveland knew before he presented the declaration to the court that Gillig's allegations were bizarre and facially implausible, that Gillig had already been judicially determined to be a fabricator, who previously had given false declarations in Triple Tee I,[21] and

_____

[21]If, as he said he did, Cleveland read the undersigned's opinions before filing the Gillig

(continued...)

that the use to which Gillig's declaration was to be put was a serious matter, with the result that it had to be absolutely accurate.

Also, he had in his hands the order of the judge in the Southern District of Florida explaining why Gillig and Triple Tee were resisting transfer of the case from Florida to the undersigned, and presumably he knew that Gillig and Triple Tee did not even suggest to the court in Florida that the undersigned engaged in any of the conduct described in the Gillig declaration or displayed any bias or prejudice against Gillig or Triple Tee. If he did not already have it in his possession, Cleveland had ready access through his computer to the declaration of Gillig that Silverman and Tadros had presented to the Florida court (the month before Gillig signed the one at issue here) in support of Gillig's contention that Triple Tee II should not be transferred from Florida to the undersigned. The Florida declaration made no mention of any claim of bias or prejudice on the part of the undersigned or of any of the facts Gillig recited in his January 22, 2009, declaration.

_____

[21](...continued)
declaration, he would have seen that on two separate occasions the judicial determination was made in Triple Tee I that Gillig gave a false declaration to influence a court decision in Triple Tee I. See supra at 18 and 22.

The court can only speculate as to what drove Cleveland to participate with Silverman and Gillig in the scheme to use false information to try to persuade the court not to reassign Triple Tee II, but the court does not need to speculate as to the impropriety of Cleveland's conduct in doing so. Red flags were raised that would have prevented any reasonable and ethical attorney from participating in the scheme. Not only that, Cleveland chose not to avail himself of resources that were readily available from which he could have obtained more information.

A simple look at the docket sheet in Triple Tee I on his computer screen would have told him that Gillig was wrong when he asserted that the undersigned did and said certain things on July 15, 2004. He could have explored whether the undersigned said or did those things at any time simply by talking by telephone to one of the Fort Worth attorneys who had provided representation to Triple Tee in Triple Tee I or the Fort Worth or Chicago attorneys who had represented Nike in that case. A lawyerly questioning of Gillig undoubtedly would have convinced him that Gillig probably could not be relied on to be truthful. Cleveland had ample time after his conversation with Gillig on January 22, 2009, before the February 2 filing deadline to conduct a

meaningful investigation into the accuracy of Gillig's declaration.

Had Cleveland asked Gillig how the undersigned would have known which person in the room was Gillig when the undersigned supposedly entered the room and directed a remark to Gillig, he would have learned that the undersigned had never seen Gillig before and could not possibly have known who he was. If Cleveland read Gillig's declaration, he saw in the body of the declaration that Gillig had never met the undersigned when the undersigned supposedly recognized him and made a remark to him. Hr'g Ct. Ex. 1, Resp. in No. 4:08-CV-743-A (docket entry 37), Ex. A at 2, ¶ 6.

If Cleveland had reviewed the record of the July 6, 2005, pretrial conference, which was available to him, he would have seen that Gillig falsely stated in paragraph 7 of his declaration that at a hearing on July 6, 2005, the undersigned threatened to hold him and his lawyers in contempt. Had Cleveland obtained and viewed, as he surely could have done, a transcript of the July 5, 2007, pretrial conference, he would have seen that Gillig falsely represented in his declaration that the undersigned said, in so many words, that he was less than happy with the opinion of the Fifth Circuit and was still looking for a way to dispose of the

case, apart from trying it, but that he had not yet found one. Cleveland could have insisted on reviewing the transcript of the July 18, 2007, hearing in Triple Tee I; and, if he had, he would have seen that the representation by Gillig in paragraph 9 of his declaration was false.

Cleveland knew that the Gillig declaration was being filed for the improper purpose of presenting to the court information that suggested that the undersigned was disqualified to preside over Triple Tee II. He and Silverman had pointedly communicated about the desirability of using "recusal" language in the document Cleveland drew for the purpose of resisting Nike's motion to reassign the case. He calculatedly presented to the court for consideration in deciding an important matter a declaration that no reasonable attorney would believe was truthful.

Cleveland admitted that he questioned the truthfulness of the Gillig declaration when he presented it to the court. He did not allege in the response in opposition he prepared, and to which he attached the declaration, the facts recited by Gillig in this declaration because he had misgivings about the truthfulness of the declaration. Cleveland apparently thought he was being clever by attempting to distance himself from the declaration by

the language he used in the response, while, at the same time, inviting the court to consider the declaration in determining whether or not to grant Nike's motion to reassign the case to the undersigned.

Cleveland's deceptive conduct displays a consciousness of guilt that, as much as anything else in the record, shows that he knew he was doing something he should not have done when he attached the Gillig declaration to the response in opposition. He was forced to admit at the hearing that even if the facts alleged in the Gillig declaration were true, there would be no legal basis for a recusal of the undersigned in Triple Tee II because none of the conduct alleged by Gillig in his declaration was "extra-judicial, outside the court environs." Hr'g Tr., Vol. 2 at 91. Nevertheless, he intentionally tried to convey to the court the false impression that the undersigned engaged in conduct that would require recusal.

Cleveland defends his conduct by pointing to what he considers to be a short period of time between the date he was employed to participate in preparing and presenting the response to Nike's motion to reassign the case to the undersigned and the deadline for the filing of the response--a period of eleven days. The court has taken that factor in account in evaluating whether

Cleveland conducted "an inquiry reasonable under the circumstances." Rule 11(b). The court finds that Cleveland did not conduct an inquiry reasonable under the circumstances, including the time constraint. It is not as if Cleveland was asked to present to the court something that on its face seemed reasonable and plausible. Instead, he was asked to present factual contentions to the court that he recognized were bizarre and subject to question. Under those circumstances, a reasonable attorney simply would have declined to file the declaration without first obtaining a satisfactory level of verification of its accuracy, which Cleveland failed to do.

Before Cleveland was contacted about employment in Triple Tee II, Silverman already had sought and obtained permission to appear as an attorney for Gillig and Triple Tee in Triple Tee II on a pro hac vice basis. See Jan. 8, 2009, Appl. & Order in No. 4:08-CV-743-A (docket entry 30). If Cleveland felt that he could not withdraw from Triple Tee, for whatever reason, there is no reason why Cleveland, rather than to present the false declaration to the court, could not have insisted that Silverman sign and present the response in opposition and that Cleveland's name be omitted from the document. Remember, when Cleveland refused to sign, or permit his name to be on, the motion to

recuse in June 2010, Silverman signed and presented the motion, accompanied by the Long declaration, to the court.[22]  The court can, and does, infer that if Cleveland had refused to sign, or permit his name to be on, the response in opposition to Nike's motion to reassign Triple Tee to the undersigned in February 2009, or to participate in presenting it and its accompanying Gillig declaration to the court, either Silverman, as he did in June 2010, would have signed and presented the document or Silverman and Gillig would have been persuaded by Cleveland's refusal to participate to abandon their false declaration scheme.

Factors the Fifth Circuit has said the court may consider in determining whether there has been a compliance with Rule 11 are

> the time available to the signer for investigation; the extent of the attorney's reliance upon his client for the factual support for the document; the feasibility of a prefiling investigation; whether the signing attorney accepted the case from another member of the bar or forwarding attorney; the complexity of the factual and legal issues; and the extent to which development of the factual circumstances underlying the claim requires discovery.

Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866, 875 (5th Cir. 1988).  The court has included consideration of all those factors

---

[22]The court is persuaded by the evidence that Cleveland's refusal to sponsor the Long declaration was not because of its falsity, but was because of Cleveland's decision to withdraw due to Gillig's inappropriate conduct at the June 17, 2010, settlement conference.

in its evaluation of whether Cleveland made a reasonable inquiry into the facts before he presented the Gillig declaration to the court. As discussed above, the court finds that Cleveland had sufficient time to conduct the kind of investigation that should have been conducted into the truthfulness of the factual contentions made in the declaration. The court will assume that Cleveland placed a degree of reliance on Gillig and Silverman for the factual support for the declaration, but whatever reliance he thus placed does not begin to outweigh the other factors the court has mentioned above, such as the facial implausibility of the facts recited in the declaration, and all the other red flags that were raised as warnings to Cleveland that something was amiss. There was nothing complex about the statements of fact in the declaration. Rather simple inquiry would have led to the information that would have told Cleveland that the declaration stated false facts. There was no need for discovery. Computer research of court dockets and documents and a telephone call would have given him all the information he needed to know that factual contentions in the declaration were false. In sum, no reasonable attorney faced with Cleveland's circumstances could have believed that his conduct in filing the Gillig declaration was factually justified. From a mere reading of the declaration,

Cleveland would have realized that the statements made in it were not objectively reasonable, and, as he did, he should have had misgivings about its integrity.

Cleveland claims he attempted to call his personal friend Suder to discuss the facts recited in the declaration. But, merely attempting a call to one person when others were available does not constitute a reasonable inquiry.[23] And, more than just an "attempt" should have been made. All Cleveland was required to do to learn the identities of the many attorneys involved in Triple Tee I who could verify, or dispute, the things Gillig said in his declaration was to pull up on his computer screen the first few pages of the court's docket on Triple Tee I, which shows the name, address, and telephone number of each attorney for Triple Tee (Suder, Casto, Lauren M. Lockett, Silverman, and Long) and each attorney for Nike and Stites (Renk, van Es, Martinez, and others). Had he become curious about the identities of those present at the July 6, 2005, pretrial conference, he could have pulled up the court's docket (docket entry 163) from which he would have learned that Suder, Long, Casto, and Christie Lindsey were in attendance for Triple Tee and

---

[23]Considering the hearing testimony of Suder and Dunn, the court questions the correctness of Cleveland's testimony that he attempted to call Suder before he filed the Gillig declaration.

that Renk, Martinez, and van Es were in attendance for Nike and Stites. If he had pulled up the minutes described at docket entry 163, he would have found the identities of the court's law clerk and official court reporter who were in attendance at the pretrial conference. In other words, there were a multitude of persons with whom Cleveland could have conversed by telephone concerning the integrity of Gillig's declaration if only he had taken a few moments of his time to do so.

The court finds that Cleveland did not reasonably believe that he had the requisite knowledge, information, and belief to satisfy the certification requirements of Rule 11(b) when he presented the Gillig declaration to the court. Cleveland's apparent lack of curiosity and obvious lack of inquiry between January 22, 2009, and February 2, 2009 (when he filed the Gillig declaration) are the earmarks of an attorney who knew that he was about to present to the court false information and did not want to leave any trace of having confirmed that it was false, or, if not that, of an attorney who suspected that the document he was about to present to the court contained false information and did not want to do anything that would confirm his suspicions and thus make it difficult for him to file the document without

leaving a trace that he had confirmed his suspicions before he did so.

The court finds that the deemed Rule 11(b) certification by Cleveland when he presented the Gillig declaration to the court for consideration "that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . [the Gillig declaration was] not being presented for any improper purpose" and that "the factual contentions have evidentiary support" was a false certification in violation of Rules 11(b)(1) and (3). The court finds that when Cleveland presented the Gillig declaration to the court for consideration, Cleveland did not believe that the factual contentions contained in the declaration had evidentiary support; instead, he had reservations about the truthfulness of the recitations in the declaration. The evidence proves, and the court finds, that Cleveland did not make "an inquiry reasonable under the circumstances" to ascertain whether the factual contentions contained in the Gillig declaration had evidentiary support; and, the record establishes, and the court finds, that Cleveland presented the Gillig declaration to the court for the improper purpose of trying to leave the impression with the court

that the undersigned was disqualified from presiding over Triple

Tee II.

C.   Violations of Rule 83.8

Rule 83.8 provides in pertinent part as follows:

(b)   Grounds for Disciplinary Action.  A presiding
judge, after giving opportunity to show cause to the
contrary, may take any appropriate disciplinary action
against a member of the bar for:
     (1)   conduct unbecoming a member of the bar;
     . . . .
     (3)   unethical behavior. . . .
     . . . .
(e)   Unethical Behavior.  The term "unethical
behavior," as used in this rule, means conduct
undertaken in or related to a civil action in this
court that violates the Texas Disciplinary Rules of
Professional Conduct.

Rules 83.8(b)(1) & (3) & 83.8(e).

By the order the court signed July 22, 2010, in No. 4:08-CV-

743-A, the court expressed its tentative conclusions that

Silverman, Long, and Cleveland subjected themselves to

disciplinary action under Rule 83.8.  Each of them was provided

opportunities by that order and the order signed September 10,

2010, in this miscellaneous action to show cause why they should

not be disciplined for violations of Rule 83.8, first by filing a

written document showing cause, and, in the second instance, by

having an opportunity to show cause at the hearing ordered to be

conducted October 27, 2010.

having an opportunity to show cause at the hearing ordered to be conducted October 27, 2010.

After having considered all the evidence, the court has concluded for the reasons given below that Silverman and Cleveland should be disciplined under the authority of Rule 83.8.[24]

The court finds that the conduct the court has described in the foregoing parts of this section V on the part of Silverman and Cleveland was conduct unbecoming a member of the bar of this court as well as being in violation of Rules 11(b)(1) and (3). There is no rule of behavior for attorneys that would make the conduct of Silverman or Cleveland acceptable. In each instance, his conduct was inimical to the administration of justice.

No judge or member of the bar of this court would think it appropriate for a lawyer to suggest to the court that it consider a questionable declaration in making a judicial decision, as Silverman and Cleveland did in the case of the Gillig declaration

_____

[24]The court has concluded not to discipline Long under Rule 83.8. The rule contemplates disciplinary action against a member of the bar of this court. The court interprets that to mean a regular member of the bar, such as Cleveland, as well as a pro hac vice member, such as Silverman was in Triple Tee II at relevant times. Long was admitted pro hac vice during the pendency of Triple Tee I, and participated in the representation of Triple Tee in that action on such a basis. However, he did not provide any representation, in any capacity, to the plaintiffs in Triple Tee II. Even though Long presented a false declaration in Triple Tee II based on events that occurred while he was a pro hac vice member of this court's bar, the court is giving Long the benefit of the doubt by concluding that the court should not assert authority over him under the local rule.

and Silverman did in the case of the Long declaration. Certainly no judge or member of the bar of this court would think it appropriate for a lawyer to present to the court such a questionable declaration with the intent to thereby persuade the court that one of its judges is unqualified to preside over the case in which the document is being presented.

Therefore, the court may take any appropriate disciplinary action against Silverman and Cleveland pursuant to the authority of Rule 83.8(b)(1).

Silverman is subject to discipline under the provisions of Rule 83.8 for the further reason that his conduct in presenting to the court the Gillig and Long affidavits was unethical behavior. Rule 3.03(a)(1) and (g) of the Texas Disciplinary Rules of Professional Conduct provides in part that "[a] lawyer shall not knowingly: (1) make a false statement of material fact . . . to a tribunal" or "offer or use evidence the lawyer knows to be false." Silverman knowingly made false statements of material fact to the court, and used evidence he knew to be false, when he presented to the court the Gillig and Long declarations. He impliedly represented to the court that the statements of fact made in the declarations, which were material to the issues being presented to the court with the declaration,

were true; and he did so knowingly. Moreover, Silverman's conduct in presenting the false declarations to the court was unethical because it involved dishonesty, fraud, and misrepresentation in violation of Rule 8.04(a)(3) of the Texas Disciplinary Rules of Professional Conduct, and was conduct that adversely reflected on the honesty, trustworthiness, and fitness of Silverman as a lawyer.

D.   <u>The Court Has Decided Not to Pursue the Possibility of Sanctions or Discipline Against Silverman Based on Inappropriate Responses in His Application for Admission Pro Hac Vice in Triple Tee II</u>

On November 15, 2010, the court signed an order in this miscellaneous proceeding expressing concern about responses Silverman made in the application he filed January 8, 2009, for admission to the bar of this court on a pro hac vice basis for representation of the plaintiffs in Triple Tee II. He failed to disclose in the application he filed while Triple Tee II was on Judge Means's docket that he suffered a six-year suspension of his right to practice in the State of New Jersey and a financial punishment for practicing in the State of Florida without a license.

Had Silverman made appropriate disclosures in his January 8, 2009, application, Judge Means, when evaluating whether to grant

his request for pro hac vice admission would have known that the Supreme Court of New Jersey (a) viewed Silverman's "misconduct . . . as most serious, as falling below not only the standards required of attorneys in their private commercial dealings but below general marketplace norms of fair dealing as well," and (b) found that Silverman "subverted basic tenets of honesty in his own personal and selfish interests," and gave false testimony, which was "a fundamental breach of a lawyer's duty as an officer of the court striking at the heart of every attorney's obligation to uphold and honor the law." Matter of Silverman, 549 A.2d 1225, 1245 (N.J. 1988) (quotation marks, brackets, and ellipsis omitted).

And, if he had made a full disclosure, Judge Means would have learned that Silverman "knowingly engaged in the representation of Vista Designs in Florida even though he was not admitted to practice before [the Florida court]," Vista Designs, Inc. v. Silverman, 774 So.2d 884, 888 (Fla. Dist. Ct. App. 4 Dist. 2001), and that, because of his illegal conduct, Silverman was ordered to reimburse Vista Designs for monies it paid to Silverman for fees under the illegal contract Silverman had entered into with Vista Designs to represent it in Florida, id.

In response to the November 15, 2010, order, Silverman filed on December 10, 2010, his declaration, with several attachments. His primary explanation for non-disclosure as to Matter of Silverman was that he "voluntarily withdrew from the practice of law for the period of investigation and disposition of the ethics allegations" and that his "membership in the Bar of the State of New Jersey was not involuntarily suspended." Decl. of Silverman filed Dec. 1, 2010 (docket entry 17) at 1. He added that he has "never involuntarily lost, temporarily or permanently, the right to practice law before any court or tribunal." Id. at 2. The main excuse Silverman provided as to the Vista Designs, Inc. matter is that information concerning that matter was not called for by his application for pro hac vice inasmuch as "Vista Designs did not result in any suspensions, voluntary or otherwise." Id.

The court questions the candor of Silverman's response, particularly as it pertains to Matter of Silverman. Silverman's December 1, 2010, responsive declaration does not fairly disclose what happened in that proceeding. He fails to acknowledge that he was suspended from the practice of law in New Jersey for over six years. The Supreme Court of New Jersey described his loss of the right to practice in that state by saying, "respondent has

103

been suspended from practice in this state for over six years"
and that "[s]uch a suspension is unusual and, because of its
severity, has been compared to disbarment." Matter of Silverman,
549 A.2d at 1246. His six-year suspension was ordered by the New
Jersey Supreme Court to be appropriate discipline for his
violations of various disciplinary rules. Id. at 1247.

When Silverman applied for pro hac vice status in Triple Tee
I in October 2004, he responded to a question asking about
grievance proceedings or involuntary removal proceedings while a
member of the bar of any state court, by saying: "In 1983 I
accepted a voluntary suspension from the NJ [sic] Bar (the
details are set forth in the attached Opinion)." Appl. and Order
for Admis. Pro Hac Vice filed Oct. 27, 2004, in No. 4:04-CV-302-A
(docket entry 56) at 2. The "attached opinion" was a manuscript
version that appears to have the same text of the opinion
reported at 549 A.2d 1225. The court, acting through the
undersigned, gave Silverman the benefit of the doubt by giving
him pro hac vice status in Triple Tee I. Order dated Oct. 29,
2004, in No. 4:04-CV-302-A (docket entry 57). Judge Means might
have done the same even if he had been given full information in
the application Silverman submitted to him. The point is that
Judge Means was denied the information, and thus was prevented

from having the opportunity to take it into account in deciding whether to grant Silverman's application.

Nevertheless, the court concludes that nothing worthwhile would be gained from taking separate disciplinary or sanction action against Silverman based on the conduct discussed under this heading. However, the court has considered such conduct in determining the severity of sanctions and discipline Silverman should receive.

VI.

## Sanctions and Discipline Being Imposed

A.  Underline As to Gillig[25]

Rule 11(c)(1) provides that if the court has made a determination that Rule 11(b) has been violated, the court may impose an appropriate sanction on any party who is responsible for the violation.[26] The evidence establishes, and the court

---

[25]While sanctions against Triple Tee would be justified, the court has concluded that whatever sanction it might impose against the corporation would be an exercise in futility.

[26]Rule 11(c)(1) provides as follows:

(1) *In General*. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

Fed. R. Civ. P. 11(c)(1).

finds, that Gillig was responsible for the Rule 11 violations related to the presentation to the court of his and Long's declarations. Not only was he responsible for those violations, he appears to have committed the criminal offenses of perjury and subornation of perjury.

Section 1621 of title 18 of the United States Code provides, in pertinent part, as follows:

Whoever--

. . . .

(2) in any declaration . . . under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both.

Section 1622 of the same title provides:

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.

The court considers the appropriate action to be taken as to Gillig is to refer the matter to the United States Attorney for the Northern District of Texas to initiate, and prosecute Gillig for, any criminal action that might be appropriate under the

circumstances, including, of course, the offenses of perjury for giving his false declaration and subornation of perjury for procuring Long to give his false declaration.

B.    As to Long

As with Gillig, Long appears to have committed the offense of perjury when he provided his false declaration to be presented to the court in June 2010 with the motion to recuse.  The court has concluded that in addressing Long's conduct, the court should request the United States Attorney for the Northern District of Texas to give consideration to initiating and prosecuting whatever criminal action against Long is appropriate for whatever offense or offenses Long may have committed, including perjury.

In addition, to address Long's violation of Rule 11, the court hereby ORDERS that:

1.    Long is prohibited for a period of ten years from the date of the signing of this memorandum opinion and order from seeking admission to the bar of this court or approval of this court for him to appear on a pro hac vice basis as an attorney for any party in any action pending in this court.

2.    Before August 1, 2011, Long shall attend thirty hours of a course or courses at an accredited law school, acceptable to this court, on the subjects of his ethical obligations to the

court, his clients, and opposing counsel and parties.  By

February 15, 2011, Long shall file in the above-captioned

miscellaneous proceeding a document describing by name of course,

identity of law school at which the course is to be attended, the

subject matter to be taught during the course, and the time

period of his planned attendance, each course he plans to attend

in satisfaction of the requirement of the immediately-preceding

sentence.  By September 1, 2011, Long shall file in the above-

captioned miscellaneous action a document providing verification,

in affidavit or declaration form, that Long has complied with his

obligations under this paragraph 2.

3.    The clerk of court is to send a copy of this order to

the attorney disciplinary authorities of the State of Florida so

that they will be aware of, and can take appropriate action with

reference to, Long's conduct, as described in this memorandum

opinion and order, that the court views to be unethical, at least

as measured by the standards of conduct in Texas.

C.    <u>As to Silverman</u>

There is a probability that Silverman could be held

criminally responsible under 18 U.S.C. § 1622 for procuring,

either as a direct principle or as an aider and abetter, Gillig

and Long, or one of them, to commit perjury in respect to the

declarations of Gillig and Long he used in Triple Tee II. As part of the action the court is taking as to Silverman, the court is referring the matter to the United States Attorney for the Northern District of Texas for the taking of any appropriate criminal action against Silverman.

In addition, to address Silverman's violation of Rule 11, the court hereby ORDERS that:

1.    Silverman is prohibited permanently from seeking admission to the bar of this court or approval of this court for him to appear on a pro hac vice basis as an attorney for any party in any action pending in this court.

2.    Before August 1, 2011, Silverman shall attend thirty hours of a course or courses at an accredited law school, acceptable to this court, on the subjects of his ethical obligations to the court, his clients, and opposing counsel and parties. By February 15, 2011, Silverman shall file in the above-captioned miscellaneous proceeding a document describing by name of course, identity of law school at which the course is to be attended, the subject matter to be taught during the course, and the time period of his planned attendance, each course he plans to attend in satisfaction of the requirement of the immediately-preceding sentence. By September 1, 2011, Silverman

shall file in the above-captioned miscellaneous action a document providing verification, in affidavit or declaration form, that Silverman has complied with his obligations under this paragraph 2.

3.    The clerk of court is to send a copy of this order to the attorney disciplinary authorities of the State of New Jersey so that they will be aware of, and can take appropriate action with reference to, Silverman's conduct, as described in this memorandum opinion and order, that the court views to be unethical, at least as measured by the standards of conduct in Texas.

As disciplinary action to address Silverman's violation of Rule 83.8, the court hereby ORDERS that by February 15, 2011, Silverman pay $8,058.89 to the clerk of court, at the clerk's Fort Worth Division office, to reimburse the court for one-half of the payment the court has made to Kirkley as compensation to him for the time and expense he devoted and incurred in providing assistance to the court in this miscellaneous proceeding.[27]

---

[27]Kirkley submitted a statement for time and expenses devoted to the work he did pursuant to his appointment to assist the court in these proceedings in the total amount of $16,117.79, which has been paid by the court.

D.    As to Cleveland[28]

To address Cleveland's violation of Rule 11, the court hereby ORDERS that:

1.    Cleveland's membership in the bar of this court is suspended for a period of two years, with the suspension to commence February 15, 2011, except that the suspension does not apply to representation by Cleveland of a party or parties in any action in which he is now an attorney of record for such party or parties.

2.    Before August 1, 2011, Cleveland shall attend thirty hours of a course or courses at an accredited law school, acceptable to this court, on the subjects of his ethical obligations to the court, his clients, and opposing counsel and parties.  By February 15, 2011, Cleveland shall file in the above-captioned miscellaneous proceeding a document describing by name of course, identity of law school at which the course is to

_____

[28]Cleveland testified that he is with the law firm of Brackett & Ellis, P.C. Hr'g Tr., Vol. 2 at 9. Rule 11(c) provides in part that "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Fed. R. Civ. P. 11(c)(1). The court is not sanctioning the law firm for the conduct of Cleveland that is described in this memorandum opinion.  So far as the court can tell, Cleveland's conduct was part of a lark of his own. The court has no indication that other members of the law firm participated in any of the decision-making of Cleveland described in this memorandum opinion.  While it may be stretching a point, the court concludes that for such reason there are exceptional circumstances why Brackett & Ellis, P.C., should not be held jointly responsible for Cleveland's violations of Rule 11(b).  The court adds that there could be a question as to whether the obligation to hold a law firm accountable is applicable if the Rule 11 proceeding has been initiated by the court rather than by a party.

be attended, the subject matter to be taught during the course, and the time period of his planned attendance, each course he plans to attend in satisfaction of the requirement of the immediately-preceding sentence. By September 1, 2011, Cleveland shall file in the above-captioned miscellaneous action a document providing verification, in affidavit or declaration form, that Cleveland has complied with his obligations under this paragraph 2.

As disciplinary action to address Cleveland's violation of Rule 83.8, the court hereby ORDERS that by February 15, 2011, Cleveland pay $8,058.89 to the clerk of court, at the clerk's Fort Worth Division office, to reimburse the court for one-half of the payment the court has made to Kirkley as compensation to him for the time and expense he devoted and incurred in providing assistance.

*     *     *     *     *     *

All the findings of the court stated above in sections V and VI are made on the clear and convincing evidence standard.

In determining what sanctions to impose for Rule 11 violations, the court has focused on ensuring that the sanctions are severe enough to deter repetition of the offending conduct or comparable conduct by similarly situated persons, but not more

112

severe than is reasonably necessary to accomplish that goal. The discipline the court has imposed for the Rule 83.8 violations has taken into account the importance that members of this bar conduct themselves in an appropriate manner, showing due respect to the court and its judges, as well as opposing attorneys and parties and the public. The combination of sanctions and disciplinary action as to each Silverman and Cleveland constitutes the least severe combined actions the court can take that would appropriately address what the court considers to be serious violations by each of them of their duties to the court, their ethical obligations, and their responsibilities to the public and opposing attorneys and litigants.

The court directs the clerk to send a copy of this memorandum opinion and order to the United States Attorney for the Northern District of Texas with an appropriate explanatory letter of transmittal, and the court hereby requests that he initiate, and prosecute, Gillig, Long, and Silverman for any criminal action that might be appropriate under the circumstances.

The court further directs the clerk to send a copy of this memorandum opinion and order, accompanied by an appropriate explanatory letter of transmittal, to the authorities in the

State of New Jersey responsible for attorney discipline so that they will be aware of the conduct of Silverman described in this memorandum opinion and order and can take whatever action is appropriate.

The court further directs the clerk to send a copy of this memorandum opinion and order, accompanied by an appropriate explanatory letter of transmittal, to the authorities in the State of Florida responsible for attorney discipline so that they will be aware of the conduct of Long described in this memorandum opinion and order and can take whatever action is appropriate.

SIGNED January ___5___, 2011.

_____
JOHN McBRYDE
United States District Judge