United States Courts
Southern District of Texas
FILED

AUG 2 9 2011

Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN RE DISCIPLINARY AND       §
SANCTION PROCEEDINGS         §
AGAINST JOHN P. GILLIG,      §
TRIPLE TEE GOLF, INC.,       §          Misc. Action No. 4:10-18
S. TRACY LONG, MELVIN K.     §
SILVERMAN, and JOSEPH F.     §
CLEVELAND, JR.               §

## MEMORANDUM OPINION DISCIPLINARY
## AND SANCTIONS REHEARING

DAVID HITTNER, Senior United States District Judge for the Southern
District of Texas, Sitting by Designation

On July 26, 2011, the undersigned conducted a show-cause hearing in
Dallas, Texas, on the above-captioned matter. Having considered the argument,
testimony, submissions, and applicable law, the Court enters the following
opinion and order.

## PROCEDURAL HISTORY

This disciplinary matter arises out of two cases involving the
misappropriation of trade secrets of golf club designs. The complex history of
these consecutive cases—spanning almost seven years—is memorialized through
multiple orders and opinions entered by several United States district and
circuit judges. For reference, the Court provides the following summary of the
procedural history of the cases, which prompted this Court to address the issue
of disciplinary proceedings at this juncture.

John P. Gillig ("Gillig") founded Triple Tee, Inc. to produce and market golf clubs that he designed. His golf club designs are unique in that they incorporate a system that allows the user to adjust the weight of the club.

In September 2000, Gillig contacted John Thomas Stites, III ("Stites") who designs golf clubs and founded Impact Golf Technologies, Inc. ("IGT"), a golf club design firm. Gillig asked Stites if IGT would be willing to fabricate a prototype golf club for Triple Tee based on Gillig's designs. Gillig and Stites then met and discussed Gillig's ideas for the golf club designs. During that meeting, Gillig showed Stites his rough prototypes and sketches. Stites then made photocopies of Gillig's materials and agreed to fabricate a prototype club for Triple Tee.

Shortly after that meeting, Nike, Inc. ("Nike") hired Stites to act as its Director of Product Creation in its golf division, and in the process, it acquired Stites's corporation. Stites informed Gillig that, because of his new association with Nike, he would not be able to make the prototype golf club for Triple Tee as he had promised. In 2002, Gillig submitted his design directly to Nike, but Nike returned the submission, indicating that it was not interested in developing those concepts.

In February 2003, Gillig attended a golf industry trade show. He noticed a line of Nike golf clubs, named CPR Wood, that had similarities to one of the golf club designs that he had previously shown to Stites. Gillig immediately suspected that Stites and Nike had incorporated his designs into the CPR Wood

2

and suspected that two other Nike clubs, Nike's Slingshot Irons and OZ T-100 putter, were also based on his designs.

1. __Triple Tee I__

On January 21, 2004, Triple Tee filed suit in the United States District Court for the Southern District of Florida against Nike, Tom Stites & Associates formerly d/b/a IGT, and Stites. *Triple Tee Golf, Inc. v. Nike, Inc.*, Case No. 4:04-CV-302-A (S.D. Fla. Jan. 21, 2004).  In this suit—the first of two—Triple Tee alleged the following causes of action:  (1) misappropriation of seven trade secrets dealing with designs of golf clubs that have adjustable weights; (2) breach of confidentiality; (3) breach of implied contract; (4) negligent misrepresentation; and (5) deceptive trade practices ("Triple Tee I").

The gravamen of Triple Tee I was Triple Tee's contention that, after Gillig had shared seven trade secrets related to his golf club designs with Stites in apparent confidence, Stites unlawfully disclosed the trade secrets to Nike, and thereafter, Nike manufactured and sold golf clubs that incorporated those trade secrets.

Two of the respondents in this disciplinary matter, attorneys Melvin K. Silverman of New Jersey ("Silverman") and S. Tracy Long of Florida ("Long"), represented Triple Tee throughout the pendency of Triple Tee I.  Silverman is a patent agent and attorney licensed in New Jersey, with a practice focusing on patent prosecution.  Long is an attorney licensed in Florida, with a practice

3

focusing on patent litigation.  During Triple Tee I, Silverman and Long were partners in the law firm Silverman Santucci, L.L.P.  Jonathan Suder ("Suder"), an attorney licensed and practicing in Texas, also represented Triple Tee during Triple Tee I.

On April 13, 2004, United States District Judge Cecilia M. Altonaga transferred the case, on an unopposed motion, to the Northern District of Texas, Fort Worth Division.  Triple Tee did not oppose the transfer because Stites and his corporation were located in Fort Worth, Texas, and many of the witnesses resided there or in the surrounding area.  United States District Judge John H. McBryde was assigned the case.

On May 13, 2005, Defendants filed a motion for summary judgment on all of Triple Tee's causes of action.  On July 13, 2005, Judge McBryde granted the motion, finding that the golf clubs at issue did not incorporate an adjustable weighting system, which was the alleged misappropriated trade secret, so the court found that no misappropriation occurred as a matter of law.  *Triple Tee Golf, Inc. v. Nike, Inc.*, No. 4:04-CV-302-A, 2005 WL 1639317, at *4 (N.D. Tex. July 13, 2005).

After the district court entered a final judgment, Triple Tee discovered that Defendants had filed two applications with the United States Patent Office during the pendency of Triple Tee I, and Defendants had failed to disclose those applications to Triple Tee during discovery.  Based on Defendants' withholding

4

of those patent applications, Triple Tee filed motions for relief from final judgment and for sanctions to be imposed on Defendants. Judge McBryde denied the motions, reasoning that, despite Defendants' wrongful conduct of failing to disclose the existence of the patent applications during discovery, the patent applications were not relevant to the case. Triple Tee appealed both the final judgment and the order denying its motion for relief and sanctions. The United States Court of Appeals for the Fifth Circuit consolidated the appeals for review.

On April 17, 2007, the Fifth Circuit reversed the district court's grant of summary judgment. *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 264 (5th Cir. 2007). The Fifth Circuit concluded that, had Nike disclosed the pending applications, the district court likely would not have limited the claims and evidence to just the two golf clubs at issue. *Id.* The scope of evidence, the Fifth Circuit determined, would have been broadened to include other Nike products that potentially embodied the alleged misappropriated trade secrets. *Id.* The practical effect of the ruling would have been "to allow [Triple Tee] to expand its claims beyond the accused clubs to include any misuse of its trade secrets and any Nike club comprehended by the subject patent applications." *Id.* at 264, 269. Based on that finding, the Fifth Circuit held that Triple Tee produced sufficient evidence to create an issue of fact on the misappropriation of trade secrets causes of action, defeating summary judgment. *Id.* at 264. The Fifth Circuit

5

reversed the district court's denial of Triple Tee's motion for relief and remanded the case for further proceedings consistent with that decision. *Id.* at 269. The mandate was issued on May 11, 2007.

On May 16, 2007, the court entered an order setting a pretrial conference on July 10, 2007 ("2007 Telephone Conference"). At that hearing, Judge McBryde questioned whether Gillig had assigned to Triple Tee whatever rights he had gained from sharing the trade secrets with Stites. Expressing doubt regarding Triple Tee's standing to bring the lawsuit, the court reopened discovery and allowed Defendants to file additional motions to address the issue of standing.

On July 20, 2007, the court ruled on a motion for leave filed by Triple Tee, which sought to supplement a report submitted by its expert witness. *Triple Tee Golf, Inc. v. Nike, Inc.*, 497 F. Supp. 2d 827, 828 (N.D. Tex. 2007). Triple Tee argued that its expert needed to supplement his report by adding opinions based on the patent applications that Defendants had wrongfully withheld. *Id.* at 828. The court denied Triple Tee's motion for leave, concluding that the supplement was not only untimely sought, but would also be futile because any additions would not change the outcome of the case. *Id.* at 835.

On July 13, 2007, Defendants filed a motion to dismiss the complaint based on Triple Tee's lack of standing. On July 18, 2007, the court held a

6

hearing on the issue of standing and assignment. On August 10, 2007, the court entered an order converting Defendants' motion to dismiss to a motion for summary judgment and granting the motion on summary judgment principles. *Triple Tee Golf, Inc. v. Nike, Inc.*, 511 F. Supp. 2d 676, 678, 703 (N.D. Tex. 2007). In its order, the court found that Triple Tee failed to raise a genuine issue of fact that it had standing to bring and pursue the action, and that an essential element of his misappropriation causes of action—that Gillig assigned to Triple Tee whatever rights Gillig acquired from his dealings with Stites in 2000—could not be proven. *Id.* The court then entered a final judgment, terminating the case again.

On June 11, 2008, the Fifth Circuit issued an unpublished opinion affirming the final judgment. *Triple Tee Golf, Inc. v. Nike, Inc.*, 281 F. App'x 358, 358 (5th Cir. 2008). The Fifth Circuit found no reversible error in the district court's determination that Triple Tee did not receive the right to sue on the claims at issue and that Triple Tee was not a "consumer" as defined by the Texas Deceptive Trade Practices Act. *Id.*

## 2.   Triple Tee II

On October 8, 2008, Triple Tee and Gillig ("Plaintiffs") filed the second suit, again in the United States District Court for the Southern District of Florida, but now only against Nike ("Triple Tee II"). Similar to Triple Tee I,

Plaintiffs asserted trade secret misappropriation claims. However, in Triple Tee II, unlike the first case, they also added causes of action for correction of inventorship. In this subsequent case, Silverman alone initially represented Triple Tee.

On December 12, 2008, Judge Altonaga, repeating the course of events that occurred during Triple Tee I, granted Nike's motion to transfer the case to the Northern District of Texas. On December 16, 2008, United States District Judge Terry R. Means was assigned the case. *John P. Gillig, et al. v. Nike, Inc.*, No. 4:08-CV-743-Y (N.D. Tex. Dec. 16, 2008).

On December 31, 2008, Nike filed a motion to reassign, moving Judge Means to transfer the case to Judge McBryde because of Judge McBryde's background experience with and knowledge of Triple Tee I. Judge Means granted Triple Tee's motion for a continuance and extended its deadline to respond to February 2, 2009.

On January 22, 2009, Joseph F. Cleveland ("Cleveland"), a shareholder in the Fort Worth law firm Brackett & Ellis, P.C., received a telephone call from an attorney acquaintance with the Dallas office of the law firm McKool Smith, P.C. During the telephone call, Cleveland's acquaintance introduced Gillig and Silverman to Cleveland. They discussed Triple Tee II and Nike's motion to reassign the case to Judge McBryde, which was still pending. Silverman and

8

Gillig requested Cleveland to represent Triple Tee and Gillig as local counsel, and on January 23, 2009, Triple Tee and Gillig entered into an engagement letter with Brackett & Ellis, P.C., retaining its services for legal representation.

On February 2, 2009, Plaintiffs timely filed their response in opposition to Nike's motion to reassign. Plaintiffs urged Judge Means to consider the testimony of Gillig, which was included through a declaration that was attached to the response, and requested that he decline to exercise his discretion to re-assign the case to Judge McBryde. In the declaration, Gillig detailed events that he believed had occurred during a pretrial conference in 2005 while Triple Tee I was pending ("2005 Pretrial Conference"). His memory of those events compelled him to believe that Judge McBryde could not be fair to Plaintiffs if he were to preside over Triple Tee II. In describing the events, Gillig referred to a diagram of a conference room where Judge McBryde held a pretrial conference, which he attached as "Exhibit A" to his declaration. The diagram identified where the parties were sitting, the path Judge McBryde took from the door of the conference room to his chair at the head of the conference room table, and the remarks Judge McBryde made prior to the court reporter transcribing the pretrial conference. Gillig drafted and signed the declaration under the penalty of perjury (the "Gillig Declaration").

9

On February 11, 2009, Judge Means granted Nike's motion and reassigned Judge McBryde to the renumbered case *John P. Gillig, et al. v. Nike, Inc.*, No. 4:08-CV-743-A (N.D. Tex.).

Thereafter, Nike filed a motion to dismiss, asserting two theories for dismissal: first, that Plaintiffs' claims were barred by res judicata and second, that the trade secrets claims were barred by limitations. On May 20, 2009, Judge McBryde granted Nike's motion to dismiss finding that all of Plaintiffs' claims were barred by res judicata. *Triple Tee Golf, Inc. v. Nike, Inc.*, 618 F. Supp. 2d 586, 599 (N.D. Tex. 2009). The court then entered a final judgment in the case and Plaintiffs appealed.

On April 20, 2010, the United States Court of Appeals for the Federal Circuit affirmed in part and reversed in part. *Gillig v. Nike, Inc.*, 602 F.3d 1354, 1363 (Fed. Cir. 2010). The Federal Circuit determined that the trade secret claims were properly dismissed because they were barred by limitations and, to the extent that Triple Tee asserted its correction of inventorship claim based on the alleged 2000 assignment, that claim was also barred because the district court had already determined, in Triple Tee I, that there was no assignment of rights. *Id.* Gillig's inventorship claims, however, were not barred. *Id.* Instead, the Federal Circuit found those claims to be justiciable and remanded the case for further proceedings consistent with the ruling. *Id.*

On remand, Judge McBryde ordered the parties to conduct a settlement conference. On June 17, 2010, the parties met at Cleveland's office for the conference, but they were ultimately unsuccessful in reaching a settlement agreement.

Later that day, Plaintiffs filed a motion for recusal, moving Judge McBryde to recuse from Triple Tee II based on a bias and prejudice that he had allegedly demonstrated toward Plaintiffs during Triple Tee I. Plaintiffs attached a declaration drafted by Long to the motion to recuse (the "Long Declaration"). In the Long Declaration, Long recounted the events that took place leading up to and during the 2005 pretrial conference, which affirmed some of the statements that Gillig had made in his declaration. Long also included a paragraph that quoted a transcript from the 2007 Telephone Conference. The transcript corroborated, in part, the statements that Gillig had alleged Judge McBryde made during and leading up to the 2005 Pretrial Conference. Silverman alone signed and filed the motion to recuse.

Twelve days later, on June 29, 2010, Cleveland filed an unopposed motion to withdraw as counsel of record for Plaintiffs due to an attorney–client impasse. On June 30, 2010, Judge McBryde granted the motion to withdraw and ordered that Plaintiffs designate replacement local counsel by July 12, 2010. Silverman remained lead counsel for Plaintiffs.

Shortly thereafter, the parties entered into a confidential settlement agreement. On July 12, 2010, Triple Tee, Gillig, and Nike filed a stipulated dismissal with prejudice. On the same day, Judge McBryde entered both an order denying Plaintiffs' pending motion for recusal and a final judgment dismissing the case with prejudice consistent with the stipulated dismissal.

### 3.   July 22, 2010 Show-Cause Order

On July 22, 2010, Judge McBryde entered a show-cause order, naming five parties—Triple Tee, Gillig, Long, Silverman, and Cleveland (the "Respondents")—and soliciting briefs from the Respondents to show cause why the court should not impose sanctions for violations of Federal Rule of Civil Procedure 11(b) and Northern District of Texas Local Rule 83.8(b)(1) and (3). *Gillig v. Nike, Inc.*, No. 4:08-CV-743-A, slip op. at 11–15 (N.D. Tex. July 22, 2010).

In the show-cause order, Judge McBryde took judicial notice that the Gillig Declaration and the Long Declaration contained false statements. *Id.* at 2–6 ("The court judicially *knows* that the undersigned did not say the things Gillig stated in his declaration . . . or the things Long stated in his declaration . . . .") (emphasis added). Judge McBryde strongly (and personally) contested the statements made in the Gillig Declaration and the Long Declaration.

12

a.   *The Gillig Declaration*

Plaintiffs filed the Gillig Declaration to bolster their response in opposition

to Nike's motion to *reassign* Triple Tee II from Judge Means to Judge McBryde.

In it, Gillig expressed his adamant belief that Judge McBryde had "exhibited

personal and extra-judicial bias and prejudice" against him during the pendency

of Triple Tee I.   Judge McBryde's show-cause order quotes the following

statements of Gillig, which Judge McBryde identified as false:

> 4.   At a status conference which I believed occurred
> July 15, 2004, during the predecessor proceeding, I was
> present at a conference in offices of Judge McBryde's
> and, in particular, at the Federal Courthouse at Fort
> Worth.   The room appeared substantially as I have
> sketched in Exh. A herewith.   As may be noted
> therefrom, I was seated toward the rear of the room in
> the guest or "non-attorney" area while my attorneys
> Tracy Long, Jon Suder [and] another lawyer from the
> Suder firm were seated at the right of the conference
> table, while the lead attorney for Nike, Chris Renk, sat
> substantially opposite to Tracy Long at the left side of
> the table. The other Nike lawyers also sat at the left of
> the table.
>
> 5.   Before the start of the status conference, Judge
> McBryde walked from a hallway into the room through
> the indicated doorway at the back of the room and,
> while standing at Location 1, turned to me and said
> "You cannot afford to be in this court" and then, as he
> walked around the conference room along the path
> showed by the dotted lines in my sketch of Exh. A,
> stopped at Location 2 and asked my attorneys if they
> had taken the case on a contingency basis and that, if
> so, they "should not expect to get a house out of this
> case."   After I heard him say this, Judge McBryde

13

continued this line of comment as he walked from
Location 2 to Location 3 in the conference room and, as
he was starting to take his seat at Location 3, I heard
him remark that the case would "never make it to his
courtroom."

\* \* \* \*

7.  At a hearing that I believed occurred on July 6,
2005, Judge McBryde threatened to hold my lawyers
and myself in contempt if we did not submit a revised
document, in language meeting with his approval, by
the afternoon of the following day.

*Id.* at 3–4.[1]

    b.   *The Long Declaration*

Plaintiffs filed the Long Declaration in support of their motion to *recuse*

Judge McBryde.  The Long Declaration corroborated the events the Gillig

Declaration recounted, but fell short of accusing Judge McBryde of harboring a

bias and prejudice against Plaintiffs.  The show-cause order quotes the following

statements of Long, which Judge McBryde identified as false:

5.  I was present at a July 6, 2005 Pretrial Conference
before Judge McBryde in the predecessor action [Triple
Tee I].

6.  I was present in the conference room and sat at
counsel's table across from Mr. Renk, one of Nike's
attorneys, as illustrated in the accompanying drawing
of Exhibit A.

---

[1] Judge McBryde declaratively disputes that Gillig attended the 2005 Pretrial
Conference.  It is uncontested by the parties, however, that Gillig was there.

14

7. In addition to myself, present in the room were Christopher Renk, Robert Martinez, Pieter van Es, Jonathan Suder, Ed Casto, John ("Jack") P. Gillig, Thomas Stites, Cindy Dunn, as well as the Court's staff.

8. Before the conference started and went on the record, I heard Judge McBryde say to John P. Gillig, while standing at Location 1 as indicated on the accompanying Exhibit A, "You cannot afford to be in this court." In addition, Judge McBryde remarked to Mr. Suder, when at Location 2 on the accompanying Exhibit A, "You should not expect to get a house out of this case."

9. I further heard Judge McBryde say, "This case will never make it to my courtroom". He said this as he started to take his seat at the head of the conference table at Location 3, as noted on the accompanying Exhibit A.

10. I was present at counsel's table and specifically recall the aforementioned comments.

*Id.* at 5–6.[2]

4.  **September 10, 2010 Show-Cause Order**

On September 10, 2010, the court entered a second show-cause order incorporating all of the findings made in the July 22, 2010 show-cause order and severing the matter of possible sanctions from the underlying lawsuit. *See In re Disciplinary and Sanction Proceedings Against John P. Gillig, et al.*, No. 4:10-MC-018-A, slip op. at 1–2 (N.D. Tex. Sept. 10, 2010). The court created a

---

[2] Judge McBryde declaratively disputes that Long attended the 2005 Pretrial Conference. The record reflects and the parties agree, however, that Long did attend the conference.

separate miscellaneous action styled *In re Disciplinary and Sanction Proceedings Against John P. Gillig, Triple Tee Golf, Inc., S. Tracy Long, Melvin K. Silverman, and Joseph F. Cleveland, Jr.*, Miscellaneous Action No. 4:10-MC-018-A (N.D. Tex.). The court's order also questioned whether Gillig, Triple Tee, and Silverman, "committed further violations of Rule 11(b) by making false statements [in the briefs they had filed as a response to the July 22, 2010 show-cause order]." *Id.* at 2–4.

In addition, the court, on its own motion, appointed J. Lyndell Kirkley ("Kirkley"), a member of the bar of the Northern District of Texas, to "assist the court in the handling of the proceedings contemplated by this order." *Id.* at 4. Northern District of Texas Local Rule 83.8(h) allows for a presiding judge "to appoint any member of the court's bar to assist in the handling of any proceeding contemplated by or resulting from this rule." N.D. TEX. LOCAL R. 83.8(h). The court ordered Kirkley to conduct an appropriate investigation to bring forward relevant evidence, prepare the presentation of that evidence, conduct cross-examination of witnesses at the show-cause hearing, and present oral or written arguments and authorities and proposed findings of facts as he deemed necessary. *In re John P. Gillig, et al.*, No. 4:10-MC-018-A, slip op. at 5. At the conclusion of Kirkley's service, he was paid $16,117.79 in legal fees, funded by the district court.

On October 27 and 28, 2010, Judge McBryde held a hearing on this disciplinary matter. During the two-day hearing, Respondents and Kirkley presented argument and examined fact witnesses. Respondents also testified on their own behalf, and Kirkley cross-examined them. During the hearing, Judge McBryde "repeatedly questioned the witnesses about [his] own statements and conduct." *In re Joseph F. Cleveland*, Misc. Action No. 11-10039, slip op. at 2 (5th Cir. Apr. 4, 2011).

## 5.  Disciplinary and Sanctions Order

On January 5, 2011, the court entered a 114-page memorandum opinion and order. *In re Disciplinary and Sanction Proceedings Against John P. Gillig, et al.*, No. 4:10-MC-018-A (N.D. Tex. Jan. 5, 2011). The order detailed the events leading up to the show-cause hearing, the court's own commentary and conclusions regarding the testimony and evidence presented at the hearing, and the court's reasoning for assessing sanctions. *Id.* Concluding that "the Gillig and Long declarations . . . contained false factual contentions," *id.* at 80, the court made the following findings:

(1)   Gillig, the individual party, violated Federal Rule of Civil Procedure 11(b) by preparing and causing the Gillig Declaration to be filed, and also committed perjury. *Id.* at 105–06. As a sanction, the court referred Gillig to the United States Attorney in the Northern District of Texas and

17

requested the United States Attorney to "initiate[ ] and prosecute" Gillig "for any criminal action that might be appropriate under the circumstances." *Id.* at 113.

(2)    Silverman violated Federal Rule of Civil Procedure 11(b) and Northern District of Texas Local Rule 83.8(b) by presenting the Gillig Declaration and the Long Declaration to the court. *Id.* at 109–10. The court determined that it was "unethical behavior," in violation of Texas Disciplinary Rules of Professional Conduct 3.03(a)(1), 3.03(g), and 8.04(a)(1). *Id.* For these violations, the court assessed the following sanctions: (i) prohibiting him permanently from seeking admission to the bar of the Northern District of Texas; (ii) requiring him to attend thirty hours of ethics classes at an accredited law school; (iii) requiring him to send a copy of the order to the New Jersey state bar disciplinary authorities; and (iv) requiring him to reimburse the court for half of the fees Kirkley charged in connection with the work he performed pursuant to Judge McBryde's appointment, which was $8,058.89.[3] *Id.* at 109–10.

_____

[3] Judge McBryde issued the show-cause order on July 22, 2010, approximately ten days after he entered a final judgment dismissing the case as a result of the parties' settlement agreement. Rule 11 reads that monetary sanctions must not be imposed by the court on its own initiative "unless the show-cause order was issued *before* voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are being sanctioned." FED. R. CIV. P. 11(c)(5)(B) (emphasis added). Silverman and Cleveland argue that the courts imposition of monetary sanctions was in error in part because the court imposed monetary sanctions even though it sua sponte entered the show-cause order *after* the parties settled the suit.

The court also referred Silverman to the United States Attorney for the Northern District of Texas and requested the United States Attorney to "initiate[ ] and prosecute" Silverman "for any criminal action that might be appropriate under the circumstances." *Id.* at 113. The court also questioned whether Silverman "aided or abetted" Gillig or Long in committing perjury when executing their respective declarations.

(3)     Long violated Federal Rule of Civil Procedure 11(b) by "present[ing] to the court" the Long Declaration. *Id.* at 107. The court declined to discipline Long under Local Rule 83.8(b) because he was not an attorney of record when the Long Declaration was presented to the court. Giving "Long the benefit of the doubt," the court "conclud[ed] that [it] should not assert authority over him under the local rule." *Id.* at 99 n.24. For the Rule 11(b) violation, however, the court assessed the following sanctions: (i) prohibiting him from seeking admission to the bar of the Northern District of Texas for ten years; (ii) requiring him to attend thirty hours of ethics classes at an accredited law school; and (iii) requiring him to send a copy of the order to the Florida state bar disciplinary authorities. *Id.* at 107–08. The court also referred Long to the United States Attorney for the Northern District of Texas and requested the United States Attorney

to "initiate[ ] and prosecute" Long "for any criminal action that might be appropriate under the circumstances." *Id.* at 113.

(4)   Cleveland violated Federal Rule of Civil Procedure 11(b) and Northern District of Texas Local Rule 83.8(b) as attorney of record by presenting the Gillig Declaration to the court. *Id.* at 111–12. The court assessed the following sanctions: (i) suspending his membership in the bar of the Northern District of Texas for two years; (ii) requiring him to attend thirty hours of ethics courses at an accredited law school; and (iii) requiring him to reimburse the court for half of the fees Kirkley charged in connection with the work he performed pursuant to Judge McBryde's appointment, which was $8,058.89. *Id.* at 111–12.

(5)   Triple Tee Golf, Inc., a party, may have committed violations justifying sanctions but that "whatever sanction [the court] might impose . . . would be an exercise in futility." *Id.* at 105 n.25.

## 6.   **The Appeal**

Cleveland appealed the order. Silverman and Gillig joined in the appeal. Long declined to join in the appeal, but because the Fifth Circuit vacated and remanded the January 5, 2011 sanctions order, the Court considers, de novo, whether any rule was violated warranting the assessment of sanctions. On April 4, 2011, the Fifth Circuit entered an order vacating and remanding the court's

order, finding that "[u]nder the particular and peculiar facts of this case, . . . the district judge was disqualified from presiding over the sanctions hearing and entering the January Order." *In re Joseph F. Cleveland*, Misc. Action No. 11-10039, slip op. at 3 (5th Cir. Apr. 4, 2011). The Fifth Circuit further instructed that the case be assigned to "a different judge to consider the question of sanctions presented by the July Order and the September Order." *Id.* at 3.

On remand, the case was assigned to Judge Means, who recused. The case was then assigned to Chief Judge Sidney A. Fitzwater of the Northern District of Texas. After consulting with the other sitting judges in the Northern District of Texas and determining that they would recuse if assigned to the case, Chief Judge Fitzwater requested Fifth Circuit Chief Judge Edith H. Jones to reassign the case to a district judge outside of the Northern District of Texas. Chief Judge Jones then assigned the case to the undersigned.

7.    <u>The Show-Cause Hearing and Testimony</u>

On July 26, 2011, the undersigned held a rehearing in the Earle Cabell Federal Building and Courthouse in Dallas, Texas, considering, de novo, the questions presented in the July 22, 2010 and the September 10, 2010 show-cause orders. Gillig appeared and was represented by Silverman; Silverman appeared pro se; Long appeared pro se; and Cleveland appeared and was represented by counsel. This section, unless otherwise noted, summarizes (and occasionally

quotes) relevant testimony Respondents presented at the rehearing. *See* Transcript of Oral Argument, In re Gillig, Misc. No. 10-018-A (N.D. Tex. July 26, 2011). This summary is provided for context and clarity. It is not intended to be an exact and full recitation of the parties' testimony. In making its ruling, the Court considered the entire record, not just what is recited in this section.

The Court addresses Triple Tee and Gillig together, because Gillig acted in his capacity as both a party himself and as Triple Tee Golf, Inc.'s corporate representative when he drafted and signed the Gillig Declaration.

a.    <u>Triple Tee and Gillig</u>

Gillig testified that the statements he made in the Gillig Declaration were based on his knowledge and memory of the events that occurred immediately prior to the pretrial conference that took place in July 2005. He stated that the declaration reflects what he remembers Judge McBryde said immediately before the pretrial conference began and the path Judge McBryde took through the conference room when he walked from the conference room door to his chair at the head of the conference room table. Gillig testified that he wanted a visual aid to demonstrate the configuration of the conference room and attached that rendering as "Exhibit A" to his declaration. He then referenced it in the declaration when explaining how he remembered Judge McBryde walked through the conference room.

When Gillig's counsel asked him about an error in his declaration regarding the date the pretrial conference occurred, Gillig testified that he had originally been mistaken. He testified that he thought the pretrial conference had taken place in 2004 when he was drafting the declaration. He remembered that it actually took place in 2005 after reviewing his travel documents. Gillig testified that it was an unintentional mistake. Finally, Gillig testified that he knew he was signing his declaration under the penalty of perjury and realized the gravity of that act.

      b.    <u>Silverman</u>

        i.    *Gillig Declaration*

Silverman testified on his own behalf at the hearing. He admitted that he helped Gillig draft the Gillig Declaration and presented it to the court. Silverman stated that he had not attended the July 6, 2005 pretrial conference and did not have personal knowledge that the facts recited in the Gillig Declaration were true. He stated that, when he presented the Gillig Declaration to the court, he was relying on the facts that Gillig and Long had relayed to him after the pretrial conference, as well as his review of the transcripts from Triple Tee I.

Silverman testified that, within hours after the 2005 Pretrial Conference, Gillig contacted him and was "very upset" and "disturbed." According to

Silverman, Gillig "recounted basically the story as it appears in his declaration." After the pretrial conference, Long also contacted Silverman and "related the same basic facts." Silverman admitted that, in recounting what had occurred, Long was not "as certain as to how serious or to what degree or what depth these comments might reflect Judge McBryde's true feelings or his capacity to act impartially."

In addition, Silverman testified that he relied on transcripts from the 2005 pretrial conference and from a separate telephone conference Judge McBryde held on July 10, 2007. During that 2007 Telephone Conference, Judge McBryde asked pointed questions to counsel about how to proceed with the case in light of the Federal Circuit's ruling that had reversed the court's grant of summary judgment in favor of Nike in part. Transcript of Telephone Conference, Triple Tee, Inc. v. Nike, et al., No. 4:04-CV-302-A (N.D. Tex. July 10, 2007). Triple Tee's local counsel—Jonathan T. Suder, Edward E. Casto, and Lauren M. Lockett—participated in the telephone conference as did Nike's counsel—J. Pieter van Es, Robert D. Martinez, and Michael H. Martin. *Id.*

In pertinent part, the transcript from the 2007 Telephone Conference reflects that Judge McBryde made the following statements:

> • Mr. Suder is obviously still thinking that somehow or other he might get a home in Florida and maybe a ski lodge in Colorado out of this case.

- [The Fifth Circuit has] ordered me to hold a trial, and I haven't figured out a way to get around that yet.

- They didn't say that if there's a different record between now and trial I had to try it to a jury.

- I don't see a way at this time where I can totally dispose of the case.

*Id.*

Silverman stated that he trusted the statements in the Gillig Declaration partly because his law partner corroborated the declaration. Silverman also stated that he "asked [Gillig] many times the degree of certainty" regarding the statements that were made. In addition, he believed that Gillig's memory of the details, and especially Gillig's desire to "graphically show where the players were in this room [and] what was said" confirmed to him that Gillig's statements were accurate.

ii.   *Long Declaration*

Silverman then explained his position regarding the Long Declaration. Silverman recognized that the motion to recuse, as opposed to the motion to reassign, "was a more serious motion, a motion with more gravity, more implications." In writing his declaration, Long referred to a transcript from the 2007 Telephone Conference that took place during Triple Tee I. The Long Declaration states, "while reading [the transcript], I noted that Judge McBryde

25

made similar comments which he alluded to Mr. Suder." Because this testimony corroborated his partner's own recollection of the events that occurred, Silverman testified that it was "sufficiently convincing" to determine veracity of the Long Declaration.

     c.    <u>Long</u>

Long represented himself at the hearing. Long testified that he did not know that Triple Tee II had originally been assigned to Judge Means, that Nike had moved to reassign the case to Judge McBryde, or that Plaintiffs filed a response with the attached Gillig Declaration. Long testified that Gillig contacted him in 2010, requesting that he sign a declaration in support of a motion for Judge McBryde to recuse. Silverman transmitted a draft of a declaration for Long to execute. Long testified that, after receiving the draft, he revised it by deleting a paragraph that sought to comment about Judge McBryde's "impartiality or bias" and including a paragraph quoting testimony from the 2007 Telephone Conference, which corroborated what he had "perceived happened the first time."

Long testified that the reason he ultimately decided to draft and sign the declaration for submission to the court was because he felt guilty about not following Gillig's initial requests to recuse Judge McBryde during the pendency of Triple Tee I. Long testified that he was specifically concerned that he had a

continuing duty to his former client.  He expressed that he did not want to stand in the way of a former client's wishes and felt he had some ongoing obligation to assist him.

During the rehearing, Long also explained that he had already completed the thirty hours of ethics courses at an accredited law school in Florida.  He testified that the Fifth Circuit vacated and remanded the sanctions order while he was taking his course, but he decided to remain in the course because that is what he believed Judge McBryde ordered him to do.

d.   Cleveland

Cleveland explained to the Court how he had been engaged in Triple Tee II.  He testified that, on Thursday, January 22, 2009, an acquaintance from a law firm in Dallas initially introduced him to Gillig and Silverman over the telephone.  It was during the telephone call when he decided to represent Gillig and Triple Tee.  He testified that, after the telephone call and aside from the execution of the engagement letter, he did not hear or receive anything from Silverman or Gillig until the following Thursday, January 29, 2009.

On that day, he received a notebook and a cover letter with the relevant documents for Triple Tee I and Triple Tee II.  Silverman also sent Cleveland the Gillig Declaration and a draft of the response in opposition to the motion to reassign.  Cleveland testified that he began looking through the documents in

27

the file on Thursday night and Friday morning. Cleveland stated that, after a review of all of the documents and the proposed response to the motion to reassign, he redrafted the response.

Cleveland further testified that he reviewed all of the live pleadings in Triple Tee II, he spoke with Silverman approximately four or five times over the three-day period, he had Silverman read excerpts of transcripts taken during Triple Tee I to him over the telephone, and he received transcript excerpts taken during Triple Tee I from Silverman's paralegal. Cleveland testified that he believed the excerpts from the transcript sufficiently corroborated the statements made in the Gillig Declaration. Cleveland also testified that the fact that Gillig signed the declaration under penalty of perjury impressed upon him the belief that Gillig would tell the truth, and he believed Gillig knew that he would be prosecuted if he did not.

Cleveland also testified that, while he was reviewing the documents, he noticed Jonathan Suder on the pleadings from Triple Tee I. Cleveland explained that Suder and he were acquaintances, and that they both served as law clerks to the same United States district judge in the Northern District of Texas. Cleveland stated that he wanted to talk with Suder prior to filing the response to the motion to reassign. He called Suder twice, once on Friday, January 29,

2009, and once on Monday, February 2, 2009—but he was unable to reach Suder until after the response was due.

With that background, the Court now considers whether Respondents should be sanctioned for violations of Federal Rule of Civil Procedure 11(b) or Northern District of Texas Local Rule 83.8(b), or both, as cited in the July 22, 2010 and September 10, 2010 show-cause orders.

## LEGAL STANDARD

### 1.   Federal Rule of Civil Procedure 11(b)

Federal Rule of Civil Procedure 11(b) requires attorneys comply with certain basic standards before presenting a document to the Court. *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1023–24 (5th Cir. 1994). Rule 11(b) reads in pertinent part:

> (b) **Representations to the Court.** By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of . . . [his] . . . knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances:*
>
> (1) it is not being presented for any improper purpose . . .; [and]
>
> \*   \*   \*   \*
>
> (3) the factual contentions have evidentiary support . . . .

29

FED. R. CIV. P. 11(b) (emphasis added). Rule 11 requires that a lawyer make a prefiling inquiry that is "reasonable under the circumstances." *Id.* The Fifth Circuit has identified the following factors as relevant to determining the reasonableness of a lawyer's factual inquiry:

(1) the time available to the signor for investigation;

(2) the extent of the attorney's reliance upon his client for factual support for the document;

(3) the feasibility of a prefiling investigation;

(4) whether the signing attorney accepted the case from another member of the bar or forwarding attorney;

(5) the complexity of the factual and legal issues; and

(6) the extent to which the development of the factual circumstances underlying the claim requires discovery.

*Thomas v. Capital Sec. Servs.,* 836 F.2d 866, 875 (5th Cir. 1988) (en banc) (internal numbers added).

In determining whether sanctions should be assessed, a court is not to judge an attorney's prefiling inquiry with the lens of 20/20 hindsight. *Sheets v. Yamaha Motors Corp.,* 891 F.2d 533, 536 (5th Cir. 1990) (cautioning that "a district court should avoid taking the benefit of hindsight and instead focus on whether, at the time it was signed, the paper was well grounded in fact and

30

warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law"). The advisory committee note likewise emphasizes that the district court "is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading was submitted." FED. R. CIV. P. 11, Advisory Committee note (1993 Amendment).

The Fifth Circuit has adopted the "snapshot" rule. "Rule 11 liability is assessed only for a violation existing at the *moment* of filing." *Marlin v. Moody Nat'l Bank, N.A.*, 533 F.3d 374, 380 (5th Cir. 2008) (emphasis added). "Rule 11 does not impose a continuing obligation on attorneys, only a standard of good faith and reasonable investigation as of the date the legal documents are signed." *Thomas*, 836 F.2d at 884. Therefore, sanctions may only be assessed when an advocated position is unwarranted at the time of the filing. *Matta v. May*, 118 F.3d 410, 415 (5th Cir. 1997); *see also F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1300 (5th Cir. 1994) ("Our precedent does not allow the imposition of Rule 11 sanctions merely for the eventual failure of factual and legal arguments . . . sanctions are to be applied where, at the time of the filing, such arguments were unwarranted.").

An attorney's compliance with Rule 11 is judged based on the objective standard of reasonableness under the circumstances. *Whitehead v. Food Max*

31

*of Miss., Inc.*, 332 F.3d 796, 802 (5th Cir. 2003). "What constitutes reasonable inquiry may depend on such factors as how much time for investigation was available to the signor; whether he had to rely on a client for information as to the facts underlying the pleading, motion or other paper; . . . or whether he depended on forwarding counsel or another member of the bar." Advisory Committee note, 97 F.R.D. 165, 167 (1983).

"[A]n attorney receiving a case from another attorney is entitled to place some reliance upon that attorney's investigation." *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 446 (5th Cir. 1992) (reversing the district court's sanctions order, noting that the lawyers were entitled to base their analysis in part upon the factual information provided by forwarding counsel). "'An attorney is also entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable.'" *Miller v. Bittner*, 985 F.2d 935, 939 (8th Cir. 1992) (quoting *Calloway v. Marvel Entm't Grp.*, 854 F.2d 1452, 1470 (2d Cir. 1988), *rev'd sub nom. on other grounds, Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989)).

## 2.   Northern District of Texas Local Rule 83.8(b)

Local Rule 83.8(b) gives a presiding judge the authority to discipline an attorney if the presiding judge finds that the attorney has committed "conduct unbecoming a member of the bar" or engaged in "unethical behavior." N.D. TEX.

LOCAL R. 83.8(b).[4] Local Rule 83.8(e) defines the term "unethical behavior," as any conduct that violates the Texas Disciplinary Rules of Professional Conduct. N.D. TEX. LOCAL R. 83.8(e).

"Conduct unbecoming of the bar" is not defined. The Supreme Court of the United States has, however, interpreted an identical phrase when it addressed the application of Federal Rule of Appellate Procedure 46, which governs the discipline of attorneys practicing before courts of appeal. *In re Snyder*, 472 U.S. 634, 644–45 (1985). The Supreme Court concluded that such conduct is "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice." *Id.* at 645.

## FINDINGS & DISCIPLINARY SANCTIONS

The following findings are made based on the sworn testimony presented at the rehearing regarding whether Respondents should be assessed sanctions—the issue raised by the July 22, 2010 and September 10, 2010 show-cause orders.

---

[4]Respondents briefed, in part, Northern District of Texas Local Rule 83.8(a), which permits the court to suspend or disbar members of the Northern District in certain circumstances. *See* N.D. TEX. LOCAL R. 83.8(a). However, Judge McBryde's show-cause orders, together with his 114-page sanctions order, ultimately based the sanctions on Local Rule 83.8(b), together with Federal Rule of Civil Procedure 11(b). Therefore, the Court herein considers only whether Respondents should be sanctioned for violating rules referred to in the show-cause orders; thus, Local Rule 83.8(b) and Federal Rule of Civil Procedure 11(b) are deemed the relevant rules for purposes of this rehearing.

The key questions, in the Court's view, are whether Respondents presented the declarations for any improper purpose, whether the factual contentions have any evidentiary support, and whether the parties made an objectively reasonable prefiling inquiry. The Court does not have the task of determining the veracity of the statements made in the declarations. It need only look at whether it was objectively reasonable for the parties and their attorneys to present the declarations to the Court on February 2, 2009, and June 17, 2010.

1.   <u>Gillig</u>

Gillig testified that he adamantly believed the statements that he made in his declaration, that he was not making the statements for any improper purpose, and that he executed his declaration knowing it was under the penalty of perjury and understanding the attendant consequences of that act. The Court recognizes that parties in the midst of a lawsuit, as opposed to an experienced attorney, may be prone to misinterpreting a judge's orders, statements, or sentiments when addressing parties. Regardless, the Court finds that Gillig, in making and executing the declaration under the penalty of perjury, did not violate Rule 11(b).

## 2.   Silverman

### a.   Presentment of the Declarations

Silverman testified that he believed the veracity of the declarations for several reasons.  First, he has represented Gillig for almost seven years of litigation and had the benefit of listening to his client's impression of the 2005 Pretrial Conference almost immediately after it occurred.  Second, Gillig insisted on hiring an independent draftsman to depict the conference room in which the pretrial conference took place.  That insistence, Silverman testified, gave him confidence that Gillig was certain that his memory of the events that took place at the pretrial conference was accurate.  Third, Gillig's signing of the declaration under the penalty of perjury impressed upon him that the statements made in the declaration were true and correct.  Finally, Long, Silverman's law partner at the time, confirmed the facts of the events leading up to the 2005 pretrial conference as Gillig had recited.

Regarding the Long Declaration, Silverman testified that he felt he could believe Long because of their partnership in the law firm.  Further, he believed that Long's Declaration was an accurate retelling of the events he recollected took place in 2005.  Like the Gillig Declaration, Long's Declaration was executed under the penalty of perjury, which Silverman also testified made him believe that Long's statements were true and accurate.

Silverman testified that he did not have a negative motive in filing the declarations: he claimed he was representing his client to the best of his ability. Silverman had a substantial amount of time to investigate whether the statements made were in fact true. He had the ability to compare the statements made in the declaration with the transcripts from the conferences and hearings that occurred during Triple Tee I, and had the benefit of one of his former law partners' perspectives, who was actually present at the 2005 pretrial conference. Further, he had the benefit of observing the entire course of litigation—beginning in 2004 and continuing through the settlement in 2010. While Silverman was likely in the best position to investigate the events that were alleged in the Gillig Declaration, he was not present at the pretrial conference. Silverman had to rely, at least to some extent, on Gillig's recollection of the events that took place leading up to and during the pretrial conference on July 6, 2005. He was not obligated to blindly follow Gillig's retelling of the events, but under the circumstances, Silverman's reliance was acceptable.

Silverman had the ability to review the record that was made throughout the duration of Triple Tee I. The transcripts allowed Silverman to compare the statements avered in the declarations with what the court reporter memorialized. Short of an exact recitation, the transcripts substantiated, to an extent, the statements Gillig and Long made in their declarations.

Silverman had every opportunity to conduct a prefiling investigation. He knew all of the attorneys involved at the relevant time and worked alongside them. He had the benefit of receiving a play-by-play immediately after the pretrial conference occurred. He was a partner of the lead litigator for Triple Tee I and had helped retain local counsel. Silverman did not accept the case from another attorney—in fact, he had been on the case from the very beginning. From the testimony, it is clear that Silverman had a handle on the complexity of the legal issues implicated and, having been on the case longer than Long or Cleveland, was probably most familiar with the fact issues.

      b.    <u>Previous Disciplinary Incidents</u>

On November 15, 2010, four months after entering the first show-cause order, Judge McBryde entered an order expressing concern that Silverman had omitted relevant disciplinary information in his pro hac vice application, which he submitted on January 8, 2009 to the bar of the Northern District of Texas. After hearing Silverman's testimony at the first show-cause hearing, Judge McBryde ultimately decided against sanctioning Silverman for those omissions. This Court has been given a well-defined task of determining whether Silverman's conduct violated Rule 11(b) or Local Rule 83.8(b), and the extent to which he should be sanctioned or disciplined due to those violations, if any. Like Judge McBryde, this Court does not find the circumstances surrounding

37

Silverman's pro hac vice application amounted to a Rule 11(b) or Local Rule 83.8 violation.

Applying the standards of Rule 11(b) and considering Silverman's testimony at the rehearing, the Court finds that Silverman's prefiling inquiry was objectively reasonable considering the factors the Court may weigh in making this determination. Accordingly the Court declines to assess sanctions.

In accord with the January 5, 2010 sanctions order, Silverman already paid to the clerk of the Northern District of Texas $8,058.89 to reimburse the court for half of the fees Kirkley charged. Based on this Court's determination that he did not violate Rule 11(b), the Court finds that the court clerk should refund his payment in the amount of $8,058.89.

3.   **Long**

Long is in the position of being the only Respondent who was present at the 2005 pretrial conference, but not involved in any capacity with Triple Tee II. Gillig had continued to call Long, urging him to support Gillig's position by submitting a declaration of his own. Long stated that he was not aware that Triple Tee II had been before Judge Means or that Plaintiffs had already made the argument that Judge McBryde should not preside over the case. Long stated that, if he had known that fact, he would not have executed the declaration.

38

Even without that knowledge, Long stated that he was hesitant to execute a declaration. He ultimately did so, though, because he did not want to inhibit his former client from proceeding with his subsequent litigation.

Long testified that he reviewed the declaration that Gillig wanted him to execute. Long revised the initial draft. He included transcript testimony from the 2007 Telephone Conference, which, in part, substantiated the statements made in the declaration. He omitted any references—overt or otherwise—that Judge McBryde had exhibited an improper bias or prejudice. Nevertheless, he felt his continuing duty to his former client compelled him to execute the declaration.

Long had nothing to gain from executing and presenting the declaration, and, in hindsight, almost everything to lose. The Court does not find there was any "improper purpose" or that the factual contentions lacked evidentiary support. To the contrary, Long testified that he was willing to execute the declaration because of his concern that he may have some continuing obligation to his client. Further, Long cited evidentiary support in his declaration, corroborating testimony memorialized by a transcript of the 2007 Telephone Conference.

Based on the testimony and the evidence before the Court, the Court finds that Long's execution and presentment of the Long Declaration does not rise to

the level of violating Rule 11(b).  Accordingly, the Court declines to impose sanctions.

4.    Cleveland

Cleveland was retained by Triple Tee and Gillig in January 2009 to serve as local counsel in Triple Tee II, approximately four years after the commencement of Triple Tee I and approximately three months after Triple Tee II had been filed.  Cleveland was retained on January 23, 2009, only ten days before a response in opposition to the motion to reassign was due.

There is no evidence that Cleveland had an improper purpose in joining in the filing of the Gillig Declaration.  Cleveland did not prepare the declaration, but testified that he felt compelled to file it because of his client's "visceral explanation of what [Judge McBryde] said."  *See* Transcript of Oral Argument, In re Gillig, Misc. No. 10-018-A (N.D. Tex. July 26, 2011).  Almost all of the factors relevant in determining the reasonableness of the lawyer's factual inquiry weigh in favor of Cleveland.  Cleveland had been retained for only ten days before the response to Nike's motion to reassign was due; and had approximately three days between the day he received copies of the documents in the file and the day the response in opposition to the motion to reassign was due.  Cleveland testified that he did not draft the Gillig Declaration and deferred

to his client and Silverman, the referring attorney, almost completely in determining that the declaration was true because Gillig was there—he was not.

The opportunity to conduct a prefiling investigation was limited at best. Working under the pressure of a short deadline—which he admittedly agreed to—Cleveland had about three days to truly investigate the veracity of the statements made in the Gillig Declaration. Cleveland testified that he did not have access to the Triple Tee I transcripts on PACER because he was not yet named an attorney of record, nor did he have the benefit of receiving input from the one attorney, aside from Silverman, that he knew worked on Triple Tee I–Suder. Additionally, Cleveland relied solely on Silverman to recite from the transcripts any probative statements Judge McBryde had made. Furthermore, Cleveland had accepted the case from a referring attorney and did not have any institutional knowledge of the proceedings.

The factual issues surrounding the submission of the Gillig Declaration were not necessarily complex, nor were the legal issues. But Cleveland testified that he knew the gravity of the motion. Cleveland testified that filing the declaration, which alluded to Judge McBryde's alleged bias and prejudice against his client, was extremely important, if not complex in its own right. Additionally, Cleveland stated he had no reason to doubt Gillig because of the details Gillig recited in the declaration, including the attached diagram of the

41

pretrial conference room, and Gillig's willingness to file the declaration under the penalty of perjury.

Finally, in considering the last factor—the factual circumstances underlying the claim—the statements Judge McBryde made prior to the pretrial conference and the path he took through the conference room cannot be confirmed with complete assurance by anyone. Those events took place almost six years ago. Without the benefit of a transcript and a video showing the physical movements of Judge McBryde and the participants in the conference room, the facts stated in the Gillig Declaration simply cannot be confirmed or denied with absolute certainty.

Regarding the presentment of the Long Declaration, Cleveland testified that Silverman told him about the motion to recuse on the same day the parties conducted the settlement conference. Cleveland refused to sign the motion to recuse and requested his administrative assistant to re-type the signature page of the motion to replace his signature block with Silverman's signature block. Shortly thereafter, Cleveland filed a motion to withdraw as an attorney of record. Judge McBryde granted the motion the day after it was filed.

The Court need not make a factual determination of Cleveland's participation, or lack thereof, in the subsequent presentment of the motion to

recuse to the court as it has determined in this order that Silverman's presentment of the Long Declaration did not constitute a violation of Rule 11(b).

5.   <u>The Appropriateness of Sanctions</u>

The Court does not need to make a determination about the accuracy of the Gillig Declaration and Long Declaration in order to conclude that Respondents presented the pleadings for a proper purpose, with some evidentiary support, and after conducting an objectively reasonable prefiling inquiry. Based on the testimony offered at the rehearing, a review of relevant portions of the Triple Tee I transcripts, and written submissions filed by Respondents, the Court finds that, applying the "snapshot" rule adopted by the Fifth Circuit, the Gillig Declaration and the Long Declaration were not filed with the court for an improper purpose, but had some evidentiary support, and the prefiling inquiry was objectively reasonable.

In light of the Court's finding that none of the Respondents violated Rule 11(b), the Court also finds that Silverman and Cleveland—attorneys of record during Triple Tee II—did not violate Rule 83.8(b) of the Northern District of Texas Local Rules. That is not to imply that a finding of a Rule 11(b) violation is a prerequisite for a finding of a Rule 83.8 violation. The Court is unwilling, however, to assess disciplinary measures for "unethical behavior" and "conduct unbecoming a member of the bar" as the Court has found that the filing of the

declarations was not improper, was substantiated at least in part by the evidence, and the prefiling investigation was objectively reasonable. Accordingly, the Court declines to discipline attorneys Silverman, Cleveland, or Long under this rule.

## CONCLUSION

Based on the foregoing, the Court

ORDERS that this disciplinary and sanctions proceeding is hereby dismissed as to John P. Gillig, Triple Tee Golf, Inc., S. Tracy Long, Melvin K. Silverman, and Joseph F. Cleveland, Jr. with prejudice.  The Court further

ORDERS that the clerk of the United States District Court for the Northern District of Texas refund to Silverman $8,058.89 previously deposited by him in the registry of the court pursuant to the prior, reversed sanctions order.

SIGNED on this 29th day of August, 2011.

_____
DAVID HITTNER
United States District Judge